No. 2014-1723

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

THE BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,

*Appellant*,

*v.*

ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.,

*Appellee*.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2013-00041.

## NON-CONFIDENTIAL BRIEF FOR APPELLANT THE REGENTS OF THE UNIVERSITY OF MICHIGAN

ROBERT M. GERSTEIN
MICHAEL R. WEINER
JENNIFER BURNETTE
MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 S. Wacker Dr.
Chicago, IL  60606
(312) 474-6300

WILLIAM F. LEE
MARK C. FLEMING
LISA J. PIROZZOLO
TASHA J. BAHAL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

November 12, 2014

*Counsel for Appellant The Regents of the University of Michigan*

## CERTIFICATE OF INTEREST

Counsel for Appellant The Board of Regents of the University of Michigan certifies the following:

1.      The full name of every party or *amicus* represented by us is:

The Regents of the University of Michigan

2.      The names of the real party in interest represented by us is:

The Regents of the University of Michigan

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Tasha J. Bahal, Mark C. Fleming, William F. Lee, Lisa J. Pirozzolo

MARSHALL, GERSTEIN & BORUN LLP:  Jennifer Burnette, Robert M. Gerstein, Michael R. Weiner

CASIMIR JONES, S.C.:  David A Casimir, John M. Jones


Dated:  November 12, 2014          */s/ William F. Lee*         
                                          WILLIAM F. LEE
                                          WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                        60 State Street
                                        Boston, MA  02109
                                        (617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................................i

TABLE OF AUTHORITIES .....................................................................................vi

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT ..........................................................................1

INTRODUCTION ....................................................................................................2

STATEMENT OF ISSUE.........................................................................................3

STATEMENT OF FACTS ........................................................................................4

    A.    The Problem: Calcification Of Implantable Bioprosthetic
          Tissues ......................................................................................4

    B.    Michigan's Patented Solution: Treating The Tissue With
          Alcohol ......................................................................................5

    C.    The Parties' Relationship ..................................................................7

          1.   St. Jude licenses the patent, touts its innovative
                advantages, and enjoys great commercial success .....................7

          2.   St. Jude stops paying and begins this proceeding.........................11

    D.    The Record Before The Board .............................................................12

          1.   The prior art references................................................................13

          2.   The record regarding combining Carpentier, Kaplan,
                and Gong ..................................................................................19

3.    The record regarding combining Levy 1992, Holman,
and Kaplan ...................................................................20

4.    The record regarding objective indicia of
nonobviousness .........................................................21

E.    The Board's Final Written Decision ...................................25

1.    Objective indicia of nonobviousness.............................25

2.    Combination of Carpentier, Kaplan, and Gong...........................25

3.    Combination of Levy 1992, Holman, and Kaplan ......................26

4.    Teaching away from treating with alcohol...................................28

SUMMARY OF THE ARGUMENT ....................................................29

ARGUMENT .....................................................................................31

I.    STANDARD OF REVIEW ................................................................31

II.    THE BOARD ERRED IN FAILING TO CONSIDER EVIDENCE OF
OBJECTIVE INDICIA OF NONOBVIOUSNESS ......................................31

A.    The Board Erred In Ignoring Evidence Of St. Jude's
Licensing Of The '775 Patent ............................................32

B.    The Board Erred In Assessing Evidence Of Commercial
Success ..........................................................................34

1.    The Board erred in refusing to consider Michigan's
evidence of commercial success ................................35

2.    The Board erred in finding no nexus between the
commercial success of the Epic and Trifecta
products and the claimed invention ..........................39

III.    THE BOARD INCORRECTLY DETERMINED THAT COMBINATIONS
        OF PRIOR ART RENDER THE ASSERTED CLAIMS OBVIOUS ...........................44

        A.    A Skilled Artisan Would Not Have Combined
              Carpentier, Kaplan, And Gong............................................................44

              1.    There is no substantial evidence of a motivation to
                    combine Carpentier, Kaplan, and Gong....................................45

                    a.    No reason to combine was offered by St.
                          Jude or explained by the Board ......................................45

                    b.    The record does not support modifying
                          Carpentier to include a rinsing step ...............................51

              2.    A skilled artisan would not have reasonably expected
                    success in combining Carpentier, Kaplan, and
                    Gong...........................................................................................53

              3.    The prior art taught away from combining
                    Carpentier, Kaplan, and Gong ..................................................54

        B.    A Skilled Artisan Would Not Have Combined Levy
              1992, Holman, And Kaplan...................................................................58

              1.    There is no substantial evidence of a motivation to
                    combine Levy 1992, Holman, and Kaplan ...............................59

              2.    A skilled artisan would not have reasonably expected
                    success in combining Levy 1992, Holman, and
                    Kaplan .......................................................................................63

              3.    The prior art taught away from combining Levy
                    1992, Holman, and Kaplan .......................................................64

IV.    THE PREAMBLE IS LIMITING ........................................................................65

CONCLUSION ...............................................................................................................66

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 2 describes sales trends and revenue information. The material omitted on pages 10 and 11 describes pricing information and sales revenue, as well as marketing information prepared by a third party ("IMS data"). The material omitted on pages 22-25 describes pricing information, sales trends, and units sold, and includes IMS data. The material omitted on pages 34, 35, and the top of page 36 describes revenue and pricing information. The material omitted in the middle of page 36 describes marketing testimony. The material omitted at the bottom of page 36 and page 37 describes IMS data and market share. The material omitted at pages 40 and 43 describes pricing information. This material was designated confidential by Appellee St. Jude pursuant to the Stipulated Protective Order and Decision Granting Entry of Stipulated Protective Order entered August 6, 2013.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ActiveVideo Networks, Inc. v. Verizon Communications Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......................................................................49

*Akzo N.V. v. United States International Trade Commission*,
808 F.2d 1471 (Fed. Cir. 1986) .......................................................................34

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) .......................................................................64

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997) .........................................................................31

*Bausch & Lomb v. Barnes-Hind/Hydrocurve, Inc.*,
796 F.2d 443 (Fed. Cir. 1986) .........................................................................48

*Berman v. Department of Interior*,
447 F. App'x 186 (Fed. Cir. 2011) ..................................................................38

*Crocs, Inc. v. International Trade Commission*,
598 F.3d 1294 (Fed. Cir. 2010) ............................................................31, 43, 56

*Deere & Co. v. Bush Hog, LLC*,
703 F.3d 1349 (Fed. Cir. 2012) .......................................................................65

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ..................................................................*passim*

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) ................................................................. 54-55

*Ecolochem, Inc. v. Southern California Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ..................................................................43, 57

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*,
261 U.S. 45 (1923) ...........................................................................................32

*Eli Lilly & Co. v. Teva Pharmaceuticals USA, Inc.*,
619 F.3d 1329 (Fed. Cir. 2010) ..................................................................46, 63

*Facebook, Inc. v. Pragmatus AV, LLC*,
    Nos. 2013-1350, 2013-1351, 2014 WL 4454956 (Fed. Cir. Sept. 11,
    2014) (non-precedential) ........................................................................65

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) .........................................................61

*In re Bond*,
    910 F.2d 831 (Fed. Cir. 1990) ............................................................44

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent
    Litigation*, 676 F.3d 1063 (Fed. Cir. 2012) ..................................38, 63

*In re Evanega*,
    829 F.2d 1110 (Fed. Cir. 1987) .........................................................48

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994) ..............................................................54

*In re Haruna*,
    249 F.3d 1327 (Fed. Cir. 2001) .....................................................54, 57

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) .........................................................39

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) .....................................................31, 46

*In re Sernaker*,
    702 F.2d 989 (Fed. Cir. 1983) ......................................................32, 33

*In re Sullivan*,
    498 F.3d 1345 (Fed. Cir. 2007) .........................................................31

*In re Vaeck*,
    947 F.2d 488 (Fed. Cir. 1991) ...........................................................53

*Innogenetics, N.V. v. Abbott Laboratories*,
    512 F.3d 1363 (Fed. Cir. 2008) .........................................................45

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) .........................................................32

*KSR International Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ..................................................................................44, 45

*Leo Pharmaceutical Products, Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) .................................................. 32, 50-51, 54, 61

*Life Technologies, Inc. v. Clontech Laboratories, Inc.*,
  224 F.3d 1320 (Fed. Cir. 2000) .................................................................... 44-45

*Mentor H/S Inc. v. Medical Device Alliance, Inc.*,
  244 F.3d 1365 (Fed. Cir. 2001) .........................................................................57

*Minnesota Mining & Manufacturing Co. v. Johnson & Johnson
  Orthopaedics, Inc.*, 976 F.2d 1559 (Fed. Cir. 1992) .........................................33

*Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*,
  139 F.3d 877 (Fed. Cir. 1998) ...........................................................................54

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .........................................................................65

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) .........................................................................65

*Plantronics, Inc. v. Aliph, Inc.*,
  724 F.3d 1343 (Fed. Cir. 2013) .........................................................................33

*Poly-America, L.P. v. GSE Lining Technology, Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004) .........................................................................65

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
  75 F.3d 1568 (Fed. Cir. 1996) ...........................................................................34

*Rexnord, Inc. v. Laitram Corp.*,
  6 U.S.P.Q. 2d 1817 (E.D. Wis. 1988)................................................................34

*Rolls-Royce, PLC v. United Technologies Corp.*,
  603 F.3d 1325 (Fed. Cir. 2010) .........................................................................41

*Saturn Manufacturing Inc. v. Williams Patent Crusher & Pulverizer Co.*,
  713 F.2d 1347 (8th Cir. 1983) ...........................................................................35

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011) .......................................................... 41

*Tec Air, Inc. v. Denso Manufacturing Michigan Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) .......................................................... 35

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA,*
    *Inc.*, 699 F.3d 1340 (Fed. Cir. 2012) ...................................... 32-33, 40

*United States v. Adams*,
    383 U.S. 39 (1966) ............................................................................ 55

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) .......................................................... 48

*Winner International Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) ...................................... 41, 42, 43, 55

## STATUTES

5 U.S.C.
    § 706(2)(E) ....................................................................................... 31

35 U.S.C.
    § 141 .................................................................................................... 1
    § 142 .................................................................................................... 1
    §§ 321 *et seq.* ...................................................................................... 1
    § 329 .................................................................................................... 1

## STATEMENT OF RELATED CASES

In *Regents of the University of Michigan v. St. Jude Medical, Inc.*, No. 2:12-cv-12908-AC-MJH (E.D. Mich.), Appellant Regents of the University of Michigan ("Michigan") has asserted claims for breach of contract and patent infringement, including based on the failure of St. Jude Medical, Inc., the parent company and real party in interest of Appellee St. Jude Medical, Cardiology Division, Inc. (together "St. Jude") to pay royalties on sales of St. Jude's "Epic" and "Trifecta" products, which practice the claims of U.S. Patent No. 5,746,775 (the "'775 patent"), the patent at issue in this appeal, and Michigan's know-how.  The district court case has been stayed pending outcome of this proceeding.

Counsel for Michigan is aware of no other cases that will directly affect or be directly affected by the Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("Board") had jurisdiction over this *inter partes* review under 35 U.S.C. §§ 321 *et seq.*  The Board's Final Written Decision dated May 1, 2014 disposed of all claims.  A1-35.  Michigan timely appealed on June 27, 2014.  A2611-2615; 35 U.S.C. § 142.  This Court has jurisdiction under 35 U.S.C. §§ 141, 329.

## INTRODUCTION

Michigan researchers Robert Levy and Danielle Hirsch developed a novel method of treating bioprosthetic tissue for use in, among others, implanted heart valves. Their method involves treating the tissue with alcohol to reduce calcification after implantation. This was an important advance, because tissue calcification could cause the valves to malfunction or require valve replacement. Michigan is the assignee of the '775 patent, which claims Dr. Levy's and Dr. Hirsch's discovery.

At the time of the invention, St. Jude was selling bioprosthetic heart valves, including a model sold under the trade name Biocor. After licensing the '775 patent from Michigan in September 1997, St. Jude developed two bioprosthetic heart valves, Epic and Trifecta, which use Michigan's patented method of treating bioprosthetic tissue with alcohol to prevent calcification. A916-934. St. Jude marked its Epic and Trifecta valves with the '775 patent and aggressively touted the benefits of Michigan's patented anticalcification technology. █████████
████████████████████████████████████████████
████████████████

St. Jude paid Michigan royalties on these products for nine years. On June 13, 2011, with sales of these products exceeding ███████████ (A901), St. Jude stated it would stop paying, and then terminated the license. After Michigan

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

sued, St. Jude began this *inter partes* review, contending that—even though St. Jude licensed the '775 patent and touted its innovation for years—the relevant claims were obvious.

The Board's decision contains several errors, any one of which requires reversal or vacatur. The Board erred with respect to objective indicia of non-obviousness, either misunderstanding or completely ignoring St. Jude's licensing of the '775 patent and its nexus to Epic's and Trifecta's commercial success. And the Board's conclusions that a skilled artisan would have been motivated to combine two sets of three references and reasonably expected success from either combination were also unsupported. The only evidence regarding such combinations was from Michigan's expert Dr. Frederick Schoen, who explained in detail—without contradiction by St. Jude—that two references *teach away* from the patented invention and that a skilled artisan would not have been motivated to perform, or reasonably have expected success from, either combination. The Board's decision should be reversed or vacated.

## STATEMENT OF ISSUE

Whether the Board erred in ruling that claims 23 and 25-29 of the '775 patent are unpatentable as obvious.

## STATEMENT OF FACTS

### A.    The Problem: Calcification Of Implantable Bioprosthetic Tissues

Surgical implantation of prosthetic heart valves is often the only treatment available for heart valve disease.  A47(1:28-30).  Because valves made of synthetic materials are prone to complications, "bioprosthetic" tissues—tissues derived from animals, such as cows or pigs—are preferable.  A47(1:25-39).  However, bioprosthetic tissues can calcify, resulting in the "undesirable deposition of calcium phosphate mineral salts."  A47(1:41-43, 1:61-64).  Calcification reduces tissue flexibility and "can result in sudden, unpredictable failure of the valve." A165(2:46-47)(Carpentier).

As of October 1993, the priority date of the '775 patent (A502), calcification was the most frequent cause of clinical failure of bioprosthetic heart valves derived from porcine and bovine tissue, and their use was limited generally and even contraindicated for children.  A47(1:41-44, 1:50-55); A147(1:54-61)(Levy 1992) ("Over 50% of all reported valve implants placed in children under the age of 15 years at the time of initial implantation result in bioprosthesis failure due to calcification within 5 years."); *see also* A165(1:39-41)(Carpentier); A462(Gong).

At the time of the invention, skilled artisans did not understand *how* bioprosthetic tissues calcified.  A47(1:61-62); *see also* A147(2:12-13)(Levy 1992); A464(Gong).  However, research showed that treatments designed to stabilize

bioprosthetic implants to protect against degradation after implantation (known as "fixation" or "tanning" treatments) made calcification worse. A462(Gong). In particular, glutaraldehyde, "the agent of choice" for tanning, was thought to "promote calcification." A47(2:8-19); *see also* A462(Gong) ("It appears that aldehydes play an important role in the calcification of bioprosthetic valves."). As a result, there was a need to "revers[e] the calcification-promoting effects of [tanning] agents such as glutaraldehyde." A47(2:20-22); *see also* A632-633(¶17)(Schoen); A147(2:9-11)(Levy 1992); A165(1:42-43, 2:3-5)(Carpentier).

### B.    Michigan's Patented Solution: Treating The Tissue With Alcohol

Supported by an award from the National Institutes of Health (A47(1:18-20)), Michigan researchers Drs. Levy and Hirsch discovered a solution. They found and proved that treating bioprosthetic tissue with alcohol at a sufficient concentration for sufficient time reduced calcification after implantation almost entirely. One of the Michigan experiments showed that ethanol (an alcohol) in concentrations of 50% or greater "virtually eliminated calcium accumulation in the porcine aortic valve specimens as compared to glutaraldehyde-pretreated controls" after 21 days of implantation in weanling rats (the accepted model for small animals). A50(7:19-24); A41(Fig.1). Another experiment showed that treatment with 80% ethanol for 72 to 96 hours before implantation showed "[c]omplete inhibition of calcification" even after 150 days of implantation in juvenile sheep

(A50(8:41-49)), the standard large animal model required by the Food and Drug Administration ("FDA").  A633-634(¶19); A709.  The inventors also disclosed that, in preferred embodiments, the tissue should be "rinsed prior to implantation or storage to remove excess alcohol and other deleterious components produced or used in the biomaterial treatment protocol."  A49(5:5-11).

This was a breakthrough, because while alcohol had been used to sterilize bioprosthetic materials or as a solvent in other biomaterial treatment protocols, there had "never been any teaching or suggestion that ethanol has any effect on prevention of pathologic calcification."  A47(2:63-64).  Where the prior art used alcohol as a sterilant or a solvent, the alcohol was not an active anticalcification agent; rather, the prior art described active ingredients other than alcohol—such as aluminum ($Al^{3+}$), iron ($Fe^{3+}$) or tin ($Sn^{3+}$) cations—to mitigate calcification.  A641-644(¶¶32-35).  And as Michigan's expert Dr. Frederick Schoen explained without contradiction, the prior art's use of alcohol was consistent with the understanding that some alcohols may be useful as solvents or sterilants, but not as anticalcification agents.  *Id.*

The '775 patent issued to Drs. Levy and Hirsch on May 5, 1998 and is assigned to Michigan.  Claim 23, the sole independent claim at issue, states:

> A method of making calcification-resistant biomaterial for use in the interior of a human or animal, the method comprising the steps of:

a) subjecting glutaraldehyde pre-treated bioprosthetic
tissue, wherein the bioprosthetic tissue is a collagenous
material derived from a mammalian species selected
from the group consisting of bovine pericardium, porcine
aortic heart valves, saphenous bypass grafts, aortic
homografts, and dura mater, to an aqueous, treatment
solution of at least about 50% by volume of a water-
soluble C1-C3 aliphatic alcohol for a period of time
between about 20 minutes and 96 hours; and

b) rinsing the bioprosthetic tissue.

A54(15:4-16). Dependent claims 25-29 recite additional anticalcification

strategies: that "the alcohol is ethanol" (claim 25); the use of particular salts

(claims 26-27); and particular concentrations of alcohol (claims 28-29).

A54(15:22-16:6).

## C.    The Parties' Relationship

### 1.    St. Jude licenses the patent, touts its innovative advantages, and enjoys great commercial success

St. Jude is a large medical device company that manufactures, among many

other products, implantable heart valves. Prior to Michigan's invention, St. Jude

manufactured heart valves under the trade name "Biocor." A899; A902. Biocor

valves have no anticalcification treatment, and St. Jude stated that it needed an

anticalcification process for its heart valves to remain competitive. A1409(¶31).

On September 1, 1997, St. Jude exclusively licensed the '775 patent and

related technology from Michigan for use in bioprosthetic devices for

cardiovascular applications. A916-935. St. Jude then developed two products that

use the patented technology: Epic and Trifecta.  Epic, which received FDA

approval in 2007, is a bioprosthetic heart valve identical in all respects to Biocor,

with the notable exception that Epic features Michigan's patented anticalcification

treatment.  A875; A902.  St. Jude's press release announcing Epic's launch

invoked Michigan's technology, describing Epic as "***set[ting] a new standard*** for

addressing tissue mineralization and potentially extending long-term valve

durability" by "incorporat[ing] ***patented anti-calcification technology*** designed to

protect against tissue mineralization, or hardening."  A902 (emphasis added).

St. Jude's Trifecta valve, which received FDA approval in 2011 (A792) and

which utilizes porcine pericardium tissue as well as the bovine tissue used in Epic

and Biocor (A958), is also manufactured using Michigan's patented

anticalcification process (A749).  St. Jude again emphasized the patented

technology in launching Trifecta, noting that the product "include[s] … the St.

Jude Medical patented Linx(TM) technology, an anticalcification treatment

designed to reduce tissue mineralization (hardening), a common complication in

previous generations of tissue valves."  A905.  "Linx Technology" is a trademark

used by St. Jude for its implementation of Michigan's anticalcification technology.

A878(Trifecta Instructions for Use).

For purposes of this appeal, there is no dispute that St. Jude manufactures

Epic and Trifecta using the '775 patent's process.  A26-27 n.10; A2530.  Epic and

Trifecta are marked with the '775 patent number (A899; A880), and commentators have expressly noted that St. Jude's "Linx Technology" employs Dr. Levy's invention. *E.g.*, A875 ("St. Jude Medical incorporates an innovative anticalcification process into the [St. Jude] Epic valve. ***Developed and patented by Robert Levy, MD***, Linx Technology works to provide a shield against calcification." (emphasis added)).

For several years, St. Jude marketed Epic and Trifecta with specific reference to the '775 patent. *E.g.*, A903; A905. And St. Jude told its customers that the patented method had been "***demonstrated to resist calcification*** in four ways: [r]educes free aldehydes[,] [e]xtracts lipids[,] [m]inimizes uptake of cholesterol[,] [s]tabilizes leaflet collagen." A1429. St. Jude's Epic marketing materials made clear that the only difference between Biocor and Epic was that Epic used the "patented, proprietary valve treatment":



A1420 (highlighting added); *see also* A903 ("Identical in design to the company's Biocor(TM) Valve … the Epic Valve also incorporates patented anti-calcification technology designed to protect against tissue mineralization, or hardening.");

A1428 ("The Epic^TM Valve offers Linx^TM AC Technology with the design of the

Biocor^TM Valve."); A1432 (same).  Similarly, St. Jude promoted Trifecta by

touting the anticalcification technology:

## A Patented Solution to Minimize Calcification and Deterioration

The proprietary Linx'" anticalcification (AC) technology is designed to enhance the long-term performance of the Trifecta valve.*
In animal studies, the Linx AC technology treatment has demonstrated resistance to calci fication in four ways.

A1458; *see also* A905 ("Additional attributes of the Trifecta valve include …

patented Linx(TM) AC Technology, an anti-calcification treatment designed to

reduce tissue mineralization (hardening), a common complication in previous

generations of tissue valves."); A969 (describing Linx technology as having

"demonstrated improved efficacy in preventing calcification "); A1009 (describing

Trifecta and noting that the Linx technology meets "the goal [of] durability");

A1458 ("The proprietary Linx^TM anticalcification (AC) technology is designed to

enhance the long-term performance of the Trifecta valve.")

St. Jude's promotion and use of the patented anticalcification technology

paid off. ██████████████████████████████████████ (A1936),

████████████████████████████ A901. ████████████

████████████████████████████████████████

- 10 -

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

████████████████ *Id.* ████████████████████████████

████████████████████████████████████████ A1936.

## 2.    St. Jude stops paying and begins this proceeding

The License Agreement required St. Jude to pay a 5% royalty on net sales of Epic and Trifecta products covered by Michigan's patents, and 3% on all other net sales of Epic and Trifecta.  A919-921.  St. Jude complied until 2011, paying Michigan millions of dollars in royalties on these products.  A944("[St. Jude] admits it paid a royalty of 5% on its sales of the … Epic™, and Trifecta™ products[.]").[1]

In 2011, St. Jude first asserted that some of the Epic and Trifecta products were not subject to royalty obligations.  St. Jude made no claim that its U.S. products were not made using the patented method or that the patent was invalid.  Rather, St. Jude contended that, since at least 2009, its manufacturing methods for products sold in certain jurisdictions were not royalty-bearing.  St. Jude sought to apply royalties paid on such foreign products as "credits against the royalties which were due in the U.S."  A958.  St. Jude expressly did not dispute its royalty obligations on U.S. products.  *Id.* ("[W]e have not directed our letter to all jurisdictions, including, for example, the United States, where we have not presently asserted an overpayment of royalties.").

---

[1] St. Jude's royalty obligations began in 2003 for Epic and 2007 for Trifecta, because St. Jude sold the products abroad before FDA approval.  A901; A916-918.

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

On July 2, 2012, Michigan sued St. Jude in the Eastern District of Michigan, alleging breach of the license agreement.  A907-935.  In its answer to Michigan's first amended complaint, St. Jude asserted that the '775 patent, which St. Jude had licensed and touted as innovative for years, was invalid as obvious.  A953.[2]

On November 9, 2012, St. Jude petitioned for *inter partes* review of claims 23 and 25-29 of the '775 patent.  The Board instituted review on May 2, 2013.  A496-511.

### D.     The Record Before The Board

Although St. Jude's petition asserted seven invalidity grounds, the Board instituted review on only two obviousness grounds, involving five references and two combinations.  A510.  The only expert testimony regarding motivation to combine, reasonable expectation of success, and teaching away came from Michigan's expert Dr. Frederick J. Schoen—Professor of Pathology and Health Sciences and Technology at Harvard Medical School (A665); Director of Brigham and Women's Hospital Biomedical Research Institute Technology Innovation Program (*id*.); and consultant to manufacturers of implantable heart valve products, including St. Jude, regarding the development of bioprosthetic materials and valves

---

[2] In March 2013, St. Jude terminated the license agreement.  Michigan subsequently added a claim for infringement of the '775 patent.  A1037.

and the failures of such products by calcification (A628-629(¶¶8-9)).  St. Jude

offered no controverting expert testimony.[3]

### 1.    The prior art references

St. Jude did not submit testimony of anyone skilled in the art, but rather

relied solely on five references—a 1992 patent by Dr. Levy himself (Levy 1992); a

1984 patent by Dr. Daniel G. Holman (Holman); a 1985 article by Dr. Svetlana

Kaplan (Kaplan); a 1991 patent by Dr. Alain Carpentier (Carpentier); and a 1991

article by Dr. G. Gong (Gong).  None of these references, alone or in combination,

disclosed or even suggested a method for making calcification-resistant biomaterial

including subjecting a glutaraldehyde-pretreated bioprosthetic tissue to a treatment

solution of at least 50% of a C1-C3 aliphatic alcohol,[4] as claim 23 requires.

A54(15:4-15).

---

[3] With its petition, St. Jude provided a declaration from Drs. Svetlana Kaplan and
Paul W. Bohn; in rebuttal, St. Jude offered a declaration from Dr. Jonathan T.
Butcher.  Dr. Kaplan primarily addressed an article she herself authored (A247-
302); Dr. Bohn addressed claim construction of the '775 patent and whether Levy
1992 anticipated claim 23 of the '775 patent (A308-317); and Dr. Butcher
addressed whether a skilled artisan would consider the Kaplan article reliable
(A1066-1098).  None opined on how a skilled artisan would understand the
remaining prior art references; whether a skilled artisan would be motivated to
combine the references or reasonably expect success in doing so; or whether any
reference taught away from the patented invention.  A1066-1094.

[4] The '775 patent discloses several examples of C1-C3 aliphatic alcohols, including
methanol, ethanol, propanol, and isopropanol (A48(3:29-32)), and the Board
construed the term broadly as covering trihydric alcohols, including glycerol (A5).

*1. Levy 1992.* Levy 1992, which was of record during the '775 patent's prosecution, discloses nothing more than what is already acknowledged in the '775 patent: alcohols have been used for purposes other than anticalcification. A148(4:15-18). Levy 1992 discloses anticalcification methods using aqueous solutions of a water-soluble aluminum compound, and states that aqueous solutions are preferred because "organic solvents"—which include alcohol—"have deleterious effects on biologically-based tissue and could have toxic effects once implanted." A148(4:5-18). As Dr. Schoen explained, Levy 1992 considered isopropanol (an alcohol) "within the contemplation of the [Levy 1992] invention" as an organic *solvent* for dissolving salts; it does not suggest using isopropanol as an anticalcification agent. A641-643(¶¶32-33); A148(4:18-21). Dr. Schoen further explained that Levy 1992's discussion of the potential "toxic effects" of such organic solvents teaches their use at relatively low concentrations, whereas the patented method requires at least 50% alcohol. A642(¶33); A54(15:13-14).[5]

*2. Holman.* Holman does not mention calcification or describe any methods of making tissues calcification-resistant. A653(¶53). Rather, Holman discloses using ethanol pretreatment for dehydration of tissues, followed by a step of tanning

---

[5] The Board rejected the assertion of St. Jude's expert Dr. Bohn that Levy 1992 anticipated the '775 patent. A11-12; A314-315(¶16). Dr. Bohn did not hold himself out as a person of ordinary skill in the relevant art, stating instead that he has ordinary skill in "chemistry." A311(¶8).

the tissue with glutaraldehyde. A306(3:19-4:8). Holman further discloses that ethanol can be used with propylene oxide as a sterilant to store the tissue. A306(3:23-26). As Dr. Schoen testified, Holman's teaching that ethanol may be used in a sterilant composition teaches nothing about its use as an anticalcification agent. A653-654(¶54).

*3. Kaplan*. Kaplan shows the well-known ***calcification*** effects of glutaraldehyde, and does not purport to teach ***anticalcification***. A647(¶42). Rather, Kaplan discloses use of a canine carotid artery as a prosthesis and describes a method of stabilizing the artery by treating it with glutaraldehyde. A236. Kaplan only briefly discusses calcification after three weeks' implantation in adult dogs of tissues stored in glutaraldehyde as compared to tissue stored in ethyl alcohol, and reported: "Calcification was detected in some grafts stored in 0.65% GA [glutaraldehyde] following 3 weeks implantation in the canine experimental model. This phenomenon was not seen in the vessels stored in ethyl alcohol." A243; A646(¶40).

Dr. Schoen explained several problems with Kaplan's disclosure, such that a skilled artisan would not have relied on it in attempting to solve the problem of calcification of bioprosthetic implants. *First*, Kaplan's limited anticalcification observations, made based on implantation of tissue in the adult canine model, would not permit a skilled artisan to draw conclusions about anticalcification of a

bioprosthetic implant, because adult dogs are generally unsusceptible to calcification, particularly accelerated calcification.  A633-636(¶¶19, 21). Calcification studies typically use young animals, in which calcification develops more quickly.  A633-634(¶19).  The standard large-animal model required by the FDA for evaluation of calcification of bioprosthetic valve implants is juvenile sheep.  A706-710; A633-634(¶19).  St. Jude itself submitted sheep data when seeking FDA approval of Epic and Trifecta.  A779-780; A800-801.  Dr. Schoen therefore testified that Kaplan's observations based on dog studies provided no meaningful information concerning calcification or prevention of calcification. A648(¶43).

*Second*, Dr. Schoen explained that a skilled artisan would not rely on Kaplan's observations, because they were made after only three weeks of implantation in an adult large animal model.  A649(¶45).  Even in the standard sheep model, a minimum of three ***months'*** implantation is required before evaluating a treatment's anticalcification effect.  A649(¶45).

*Third*, Dr. Schoen explained that Kaplan's reporting is vague and omits critical information that a skilled artisan would require before considering any of its teachings.  A650(¶47).  Kaplan reports that calcification was detected in "some" grafts stored in glutaraldehyde following 21 days implantation, and that this phenomenon was not observed in "the vessels stored in ethyl alcohol."  A243;

A650(¶47).  Kaplan fails to report how many of the 11 grafts implanted for 21 days were stored in glutaraldehyde and how many in ethyl alcohol, or how many of the 11 grafts stored in glutaraldehyde were observably calcified and how many were not.  A650-651(¶47).  This information would be necessary to a skilled artisan's evaluation of Kaplan's observations.  *Id*.  Dr. Schoen also faulted Kaplan's failure to report any information concerning longer-term implants for 56 and 112 days, including whether those longer-term implants were stored in ethyl alcohol (A651(¶48)), and failure to provide any quantitative results to assess calcification (A638-640(¶¶26-28); A650-651(¶47); A652(¶50)).  Even the Board concluded that Dr. Schoen's criticisms of Kaplan were "not wholly without merit."  A14.

4. *Carpentier*.  Carpentier, which was of record during the '775 patent prosecution, teaches away from the claimed invention, because it disclosed that ferric (iron) and stannic (tin) ions—and not alcohol—have an anticalcification effect.  A644-645(¶¶36-37).  The Carpentier discovery happened "by accident" when the inventors learned that they had stored tissue in glycerol that had been kept in a metal container and become "contaminated" with iron and tin ions.  A167(5:62-68, 6:l-12); A643-644(¶35).  Upon discovering that the tissue stored in alcohol contaminated with metal ions had relatively low calcification levels, Carpentier conducted further experiments to figure out why (A167(6:2-12)), and concluded that "the providers of this calcification mitigation were ferric and

stannic ions" (A167(6:21-22)).  *See also* A168(8:1-20) (calcification mitigation

was provided by ferric and/or stannic ions in the storage solution; alcohol without

metal ions did not provide the "calcification mitigation" that the metal ions did);

A644-645(¶¶36-37).

As Dr. Schoen explained, Carpentier teaches away from the patented

invention's use of alcohol for anticalcification, namely by disclosing that a

glycerol solution uncontaminated by metal ions "'does *not* provide the

calcification mitigation'" that Carpentier concluded resulted from ferric and

stannic ions.  A644-645(¶¶36-37) (quoting Carpentier) (emphasis added).  St. Jude

provided no expert testimony to rebut Dr. Schoen's testimony on this point.

5. *Gong*.  Like Carpentier, Gong also teaches away from the patented

invention.  A656-657(¶58).  Gong considered whether glutaraldehyde and other

aldehydes caused calcification of tissues and compared valves treated with glycerol

(no aldehyde fixative) to valves treated with glycerol and an aldehyde

(glutaraldehyde or formaldehyde) and to valves treated with glutaraldehyde and

formaldehyde only.  A462-463.  The results, reported in Gong's Table 1, show that

tissue samples treated with both glycerol and glutaraldehyde (or formaldehyde)

resulted in *significant calcification*, with most of the samples resulting in total

calcification.  A463; A656(¶58).  As further illustrated in Gong's Figure 2, tissue

treated with both glycerol and glutaraldehyde exhibited increased calcification

compared to tissue treated with glutaraldehyde and formaldehyde only.  A464-465; A656(¶58).  Gong concluded that aldehydes, including glutaraldehyde, cause calcification, stating "[a]ldehyde … [is] the villain in bioprosthetic calcification." A462.

As Dr. Schoen explained without contradiction, Gong's reported data teaches that treatment of tissue with glycerol and glutaraldehyde may result in *increased* calcification, compared to treatment with glutaraldehyde alone. A656(¶58).  Thus, Dr. Schoen explained that Gong teaches away from using glycerol—or any other alcohol—to reduce calcification of glutaraldehyde-pretreated tissue.  A657(¶58).

### 2. The record regarding combining Carpentier, Kaplan, and Gong

One of the two obviousness grounds the Board relied on involved combination of Carpentier, Kaplan, and Gong.  Dr. Schoen testified, without rebuttal, that, in view of Carpentier's disclosure of an anticalcification method using ferric or stannic ions, a skilled artisan would not be motivated to combine Carpentier with Kaplan or Gong to arrive at a different anticalcification method not disclosed or suggested in those references.  A660-661(¶64).  Dr. Schoen also explained that there would be no reasonable expectation of success in combining those references, because Kaplan and Gong do not recognize any anticalcification

effects of ethanol, glycerol, or any alcohol, and none of the references teaches a skilled artisan to use ethanol or any alcohol for anticalcification purposes. *Id*.

Dr. Schoen's unrebutted testimony was the only testimony regarding a motivation to combine these references or reasonable expectation of success. St. Jude's only affirmative evidence regarding any of these references consisted of a declaration by Dr. Kaplan herself, who admitted that she was not an expert in anticalcification methods (A826(31:23-32:12)) and was not a person of ordinary skill in the relevant art (A850(126:18-127:6)), and who purported to offer opinions on an article she herself authored (A249-250(¶¶9, 11)). The Board ultimately disclaimed reliance on her testimony. A14 n.9.

### 3.    The record regarding combining Levy 1992, Holman, and Kaplan

The Board's second obviousness ground involved combination of Levy 1992, Holman, and Kaplan. Dr. Schoen provided unrebutted testimony that a skilled artisan would not be motivated to combine Levy 1992 with Kaplan or Holman to arrive at a different anticalcification method not disclosed or suggested in those references. A659-660(¶61). This was not least because the three references teach utterly different techniques, with only one (Levy 1992) actually addressing calcification; and the prior art as a whole (including Carpentier and Gong) taught away from using alcohol for anticalcification treatment of a glutaraldehyde-pretreated prosthetic tissue. *Id.* Dr. Schoen likewise explained

without contradiction that a skilled artisan would not reasonably expect success in combining these references, because none taught a skilled artisan to use ethanol (or any alcohol) for anticalcification purposes.  A659(¶61).

St. Jude presented no controverting testimony of anyone skilled in the art regarding any motivation to combine these references, or a reasonable expectation of success in doing so.  Thus, Dr. Schoen's testimony is unrebutted.

### 4.    The record regarding objective indicia of nonobviousness

Michigan also adduced evidence of the objective indicia of the '775 patent's nonobviousness.

*1. Licensing*.  As detailed above (pp. 7-11), St. Jude licensed the '775 patent from Michigan for 17 years; marked its Epic and Trifecta products with the '775 patent number; and paid royalties to Michigan on Epic and Trifecta sales for nine years.  St. Jude also touted Michigan's "innovative anticalcification process" that was "[d]eveloped and patented by Robert Levy, MD" (A875) by highlighting: its "identical … design to the super popular Biocor™ valve, but … also featur[ing] Linx™ antimineralization technology" (A875); its "demonstrated improved efficacy in preventing calcification" (A756); and its patented design (A995; A1009) that has the ability to "reduce[] calcification" (A984; A1009) and improve durability (A1010).  St. Jude also described the patented treatment as setting "a

new standard for addressing tissue mineralization and potentially extending long-term valve durability."  A902.

St. Jude offered no contrary evidence on the subjects of its marking of products, its touting of them as incorporating patented technology, or its ability to charge higher prices for Epic than for the non-patent-practicing, but otherwise identical, Biocor products.

*2. Commercial Success.*  Michigan also showed that St. Jude's Epic and Trifecta products—made using the '775 patent's method and marked accordingly—have enjoyed great commercial success.  *See supra* pp. 7-11; A901. That success bears a nexus to the patented invention, as proven by some of the strongest evidence possible: St. Jude touted Epic as "***identical in design***" to its preexisting Biocor products, with the only difference being that Epic employed Michigan's "patented anticalcification technology," which St. Jude itself publicized.  A902 (emphasis added).  ████████████████████

████ (A1936), ████████████████████████████

████████████████████████████████████████████

████████████ A902. ████████████████████████

████████████████████████████████████████████

████████████████████████ A1936.

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

To further demonstrate nexus, Michigan proffered data from IMS, a company that St. Jude uses to obtain market share data. A1981:15-18. In addition to submitting the IMS data as received from St. Jude (A1865-1890), Michigan generated summaries showing St. Jude's total revenue and units sold for Epic and Biocor (A1999:20-2001:15; A1927-1936). *See* A1936(Table 1) ███████████

████████████████████████████████████████████████████

███ ; *id.*(Table 2) ████████████████████████████████████

████████████████████████████████ ; *id.* ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ A1936; A2008:14-16.

St. Jude's Principal Marketing Manager Scott Lien admitted that Epic and Trifecta are commercially successful (A2027:1-2028:5); that Epic and Biocor are virtually identical, except that Epic is treated with "Linx AC" anticalcification treatment (A1978:7-10); and that St. Jude believes that the Linx AC treatment may retard calcification of valves (A1955:13-22). He also admitted that, based on published animal studies, St. Jude has good reason to think its Linx anticalcification treatment is superior to its competitors' treatments (A1400-

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

1401(¶15); A1961:10-1964:7); that St. Jude uses the results of such studies to support its marketing efforts for Epic and Trifecta (A1398-1399(¶11); A1955:23-1956:1); that customers prefer Epic to Biocor (A2022:14-2023:4); ████████████ ███████████████████████████████████████ (A2011:3-2014:24).

St. Jude proffered testimony from Dr. Bruce Lytle, a cardiac surgeon at Cleveland Clinic, who asserted that features other than the patented technology factor into doctors' purchasing decisions. A1584. But Dr. Lytle admitted that he is *not familiar* with St. Jude's Epic valve (A1843(12:2-6); A1845(7-9))—thus acknowledging that he does not know why other cardiothoracic surgeons prefer Epic over Biocor—and was not aware that St. Jude describes Epic as identical to Biocor but for Epic's use of the patented anticalcification technology (A1845(18:7-20:1)). Dr. Lytle also acknowledged that companies offer anticalcification treatments because "[t]hey are hoping that they will prevent calcification of heart valves, which is one of the ways that bioprosthetic valves fail," and that, in his field, "there are some people that believe that those treatments prevent calcification." A1844(15:14-16:1).

Beyond Mr. Lien and Dr. Lytle, St. Jude presented no other evidence regarding the objective indicia of nonobviousness.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

### E.    The Board's Final Written Decision

The Board concluded that St. Jude had carried its burden to prove the asserted claims obvious.  A33.

#### 1.    Objective indicia of nonobviousness

The Board nowhere mentioned the 17-year license agreement between Michigan and St. Jude or the fact that St. Jude paid royalties to Michigan under that agreement for nine years.  And the Board dismissed ███████████████ ███████████ as "not meaningful" on the grounds that Michigan had not established that the products were commercially successful absent market share information from other companies.  A25-26.

#### 2.    Combination of Carpentier, Kaplan, and Gong

The Board held claims 23, 26, and 28-29 (but not claim 27) obvious over the combination of Carpentier, Kaplan, and Gong, because it found all claim elements in the combination of the three references.  A20-23.  In the Board's view, Carpentier taught a method for treating glutaraldehyde-pretreated bioprosthetic tissues in an aqueous solution comprising ferric ions, 1/3 glycerol, and 1/3 ethanol (or 67% alcohol), but it acknowledged that Carpentier does not teach a rinsing step (which the Michigan claims recite).  A20-21.  To compensate for this deficiency, the Board asserted that Kaplan taught rinsing the bioprosthetic tissue prior to implantation.  A21.  The Board also looked to Kaplan in rejecting dependent claim

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

25, which adds to claim 23 that "the alcohol is ethanol"; it concluded that Kaplan taught "a 50% ethanol solution" to meet the additional claim limitation.  A21.  It did this notwithstanding Dr. Schoen's criticisms of Kaplan's relevance to a person skilled in the relevant art—criticisms the Board recognized were "not wholly without merit."  A14.  Without elaboration or supporting citation, the Board stated that "[w]hatever the faults of the Kaplan experiment," a skilled artisan would not have "disregarded completely the teachings of Kaplan."  *Id*.  The Board did not explain how Gong factored into the combination.

The Board did not explain why a skilled artisan would combine these references in this manner, other than the bare assertion that Kaplan provided "a sufficient suggestion that ethanol has anticalcification properties."  A22.  The Board also cited no evidence that a skilled artisan would have reasonably expected success from the combination, and gave no basis for disregarding Dr. Schoen's unrebutted expert opinion on the issue.  *Id*.

### 3.    Combination of Levy 1992, Holman, and Kaplan

The Board also ruled the patented invention obvious over the combination of Levy 1992, Kaplan, and Holman—also without citation to the record—because it was able to find all claim elements in that combination.  A11-20.  While Levy 1992 does not disclose a step of subjecting a glutaraldehyde-pretreated bioprosthetic tissue to a treatment solution of at least 50% of a C1-C3 aliphatic

alcohol, as recited in claim 23 (A11), the Board ruled that Kaplan filled this gap by teaching a solution of greater than 50% ethanol. A12. Notwithstanding Dr. Schoen's valid criticisms of Kaplan, the Board concluded that a skilled artisan would have had "reason to investigate" substituting Kaplan's 50% ethanol into the method of Levy 1992. A14. The Board also relied on Holman's teaching that glutaraldehyde-pretreated tissue can be treated with a 70% ethanol solution, and viewed as irrelevant the fact that Holman does not teach making tissues resistant to calcification. A12.

The Board also concluded, despite Dr. Schoen's unrebutted testimony that Levy 1992 suggests to a skilled artisan that high levels of organic solvents, such as isopropanol, are potentially toxic (A642(¶33)), that Levy's isopropanol and Holman's and Kaplan's ethanol are close in structure and function, which would suggest that the two could be interchanged. A15. Moreover, because the Board construed the reference to anticalcification in the '775 patent's preamble as non-limiting, it accorded no weight to whether Levy 1992 and Holman used alcohol as a solvent or a sterilant. A15-16. The Board ruled (again without citation) that if a skilled artisan would have thought to use Kaplan's 50% ethanol as a storage medium, or Holman's 70% ethanol as a sterilant, in place of Levy 1992's isopropanol, that would have produced the claimed method, even if the artisan would not have known of its anticalcification effects. *Id.* The Board did not

explain why an artisan would have been motivated to combine those references in that way or would have had a reasonable expectation of success in doing so. Nor did the Board offer any explanation for rejecting Dr. Schoen's contrary, unrebutted testimony.

### 4.    Teaching away from treating with alcohol

The Board rejected the sole expert opinion regarding teaching away, and ruled instead that Carpentier and Gong did not teach away from the patented invention. It ruled that it would not matter if Carpentier taught away from using alcohol for anticalcification, because the references could be combined "for a reason other than anticalcification." A17-18. The Board did not indicate what that reason might be. The Board further ruled, contrary to Dr. Schoen's unrebutted testimony, that Carpentier does not say that alcohol *cannot* provide anticalcification effects, but only that alcohol containing stannic and ferric ions provides a *greater* anticalcification effect than alcohol alone. A18. Finally, the Board ruled that the method discouraged by Carpentier differed from "the scope of the claims," in that the steps are taken in the reverse order: Carpentier taught against alcohol treatment followed by glutaraldehyde tanning, whereas claim 23 recites glutaraldehyde tanning followed by alcohol treatment. A18-19.

The Board made similar rulings as to Gong, noting that one of the Gong protocols was to treat with glycerol first, then treat with glutaraldehyde, which is

the reverse of Michigan's claims.  A20.  Also, the Board found it "impossible to tell" from Gong whether glycerol increases calcification or whether formaldehyde decreases it (A20), even though Gong's reported data demonstrates that aldehydes cause calcification and that tissue treated with both glycerol and glutaraldehyde showed *increased* calcification compared to tissue treated with aldehydes only. A656-657(¶58) (citing A464(Gong Fig.2)).

## SUMMARY OF THE ARGUMENT

This case provides an unusually compelling record of objective indicia of nonobviousness.  Unable to solve the longstanding problem of calcification of bioprosthetic tissues, St. Jude exclusively licensed Michigan's '775 patent.  St. Jude not only developed new products using the patented technology, but aggressively marketed the patented technology as a main advantage of its products. With the benefit of Michigan's technology, St. Jude's Epic and Trifecta sales skyrocketed.

The Board completely and erroneously disregarded the existence of the licensing relationship, years of royalty payments, and St. Jude's admissions of nonobviousness through its marketing of the patented invention, and committed legal error in disregarding direct evidence of nexus between the patent and the commercial success of products that are marked with the patent number and incorporate the patented invention.

The Board's errors regarding the objective indicia are all the more troubling in light of the weak obviousness contentions in this case. St. Jude did not submit testimony of one skilled in the art to explain how or why a skilled artisan would piece together five prior art references that teach utterly different techniques. Nor did it offer testimony that a skilled artisan would reasonably expect success from the asserted combinations. The only such testimony was from Dr. Schoen, who explained in detail the teachings of each reference and why a skilled artisan would not make the asserted combinations and would not reasonably expect success from either one. Dr. Schoen also provided unrebutted testimony that Carpentier and Gong teach away from the claimed invention, because they teach that alcohol would not work in anticalcification treatments. The Board not only disregarded this testimony, but failed to identify any countervailing reason why a skilled artisan would be motivated to combine the references in the manner asserted. The Board also made no findings regarding reasonable expectation of success, and committed legal error by creating its own, unsupported standard for evaluating whether a reference teaches away.

Ultimately, the Board contented itself with using the issued claims as a road map through the prior art, identified all claim elements in multiple references, and then concluded—based not on evidence, but hindsight—that it was self-evident to pick and choose those elements to create Michigan's patented method,

notwithstanding St. Jude's years of marketing its novelty to its own customers and paying royalties to Michigan without protest. The Board's conclusions are unsupported by the record, and should be reversed or vacated.

## ARGUMENT

### I.    STANDARD OF REVIEW

Obviousness is a question of law based on underlying facts. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). This Court reviews the Board's compliance with the governing legal standards and ultimate obviousness conclusion *de novo*, while the Board's factual findings are reviewed for substantial evidence. 5 U.S.C. § 706(2)(E); *In re Sullivan*, 498 F.3d 1345, 1350 (Fed. Cir. 2007). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence. In reviewing the record for substantial evidence, [the Court] must take into account evidence that both justifies and detracts from the factual determinations." *Kotzab*, 217 F.3d at 1369 (citations omitted).

### II.   THE BOARD ERRED IN FAILING TO CONSIDER EVIDENCE OF OBJECTIVE INDICIA OF NONOBVIOUSNESS

Objective indicia of nonobviousness are an essential part of the obviousness inquiry. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997). They "can be the most probative evidence of non-obviousness in the record." *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (internal quotation marks omitted). Accordingly, when a patent holder presents evidence of

objective indicia, "the board must always consider such evidence in connection with the determination of obviousness." *In re Sernaker*, 702 F.2d 989, 996 (Fed. Cir. 1983); *see also Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013) ("Whether before the Board or a court, this court has emphasized that consideration of the objective indicia is *part of* the whole obviousness analysis, not just an afterthought"). This Court has not hesitated to reverse the Board's obviousness holdings for failure to consider objective indicia properly. *E.g.*, *Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013) (reversing Board's rejection of patent based on objective indicia, including licensing activities).

The Board here committed legal error in minimizing, and in some cases outright ignoring, compelling evidence of non-obviousness, including St. Jude's licensing of the '775 patent and payment of significant royalties, and the tremendous commercial success of St. Jude's products embodying the claimed invention.

## A.    The Board Erred In Ignoring Evidence Of St. Jude's Licensing Of The '775 Patent

The fact that others license a patent is strong evidence of validity. *See, e.g.*, *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 55-56 (1923) (the fact that "the makers of two-thirds of the print paper of the country are licensees of" the patent holder was "weighty evidence" of validity); *Transocean*

- 32 -

*Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1353 (Fed. Cir. 2012) (licensing activities supported a finding of nonobviousness); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1575 (Fed. Cir. 1992) ("such real world considerations provide a colorful picture of the state of the art, what was known by those in the art, and a solid evidentiary foundation on which to rest a nonobviousness determination").

St. Jude undisputedly licensed the '775 patent and has marked its Epic and Trifecta products with the '775 patent number for years. A899; A880. St. Jude has not disputed that Epic and Trifecta are both manufactured using the '775 patent's claimed process. Nor has St. Jude disputed that it promoted these products by touting the patented anticalcification treatment. *See supra* pp. 7-11.

Yet the Board's decision does not even acknowledge that St. Jude licensed Michigan's patent, much less marked its products with the patent number and touted the advantages of the patented process for many years. The Board's stark disregard of this evidence was error. *Sernaker*, 702 F.2d at 996-997 (reversing obviousness finding where Board "was silent" in the face of evidence concerning licensing of patent that had earned millions of dollars); *see also Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1356 (Fed. Cir. 2013) (reversing finding of obviousness where district court "fail[ed] to provide any meaningful analysis" of objective indicia and dismissed these considerations as not "particularly persuasive" without

adequate "findings and reasoning"); *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) ("The district court did not provide reasons for apparently discounting [appellant's] evidence of secondary considerations; that was error as a matter of law.").[6]

## B.    The Board Erred In Assessing Evidence Of Commercial Success

The Board also erred in assessing the undisputed evidence that Michigan's claimed anticalcification treatment experienced significant commercial success.

███████████████████████████████████████████████

██████████████████████████████████████████████  A901.  This is highly probative of nonobviousness.  *See Akzo N.V. v. ITC*, 808 F.2d 1471, 1481 (Fed. Cir. 1986) ("The commercial success of [the] patent has been enormous[.] … Commercial success is, of course, a strong factor favoring nonobviousness.").

The record also shows a nexus between this commercial success and the patented invention.  *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988).  St. Jude markets both Epic and Biocor, and the only difference between them is that Epic is made with the patented method and Biocor is not.  A902-904. ████████████████████████████████

---

[6] The Board's error is all the more troubling because the licensee is ***St. Jude itself***, which now asserts that its patent license was completely unnecessary.  *See Rexnord, Inc. v. Laitram Corp.*, 6 U.S.P.Q. 2d 1817, 1822 (E.D. Wis. 1988) (accused infringer's offer to purchase license to patent-in-suit for over $2.2 million "should be considered and given substantial weight" in determining nonobviousness).

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

████████████████████████ A1927-1936.  That shows a clear nexus—

indeed, perhaps the clearest possible nexus—between Epic's commercial success

and the patented invention.  The Board had no valid reason for casting this

evidence aside.

### 1. The Board erred in refusing to consider Michigan's evidence of commercial success

Although the Board held that it was "not persuaded that Michigan ha[d]

established sufficiently that the St. Jude products enjoyed commercial success"

(A25), St. Jude had *conceded* the point.  A2027:1-2028:5 (Lien) (agreeing that

Epic and Trifecta are "commercially successful product[s]"); *see Demaco*, 851

F.2d at 1394 (reversing judgment of obviousness where patent challenger

"admitted that the [patented] paving stone was commercially successful").  Nor did

the Board explain how ██████████ in U.S. sales over nine years does not show

commercial success; courts have regularly treated sales volume and revenue earned

as evidence of commercial success.  *See Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,

192 F.3d 1353, 1361 (Fed. Cir. 1999) ("[S]ales figures alone are also evidence of

commercial success."); *see also Saturn Mfg. Inc. v. Williams Patent Crusher &*

*Pulverizer Co.*, 713 F.2d 1347, 1355 (8th Cir. 1983) ("After the Saturn shredder

was introduced, there is no doubt that it attained commercial success … sales

increased from $70,000-$120,000 in 1973-74 to approximately $3.5 million in

1980").

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

The Board maintained that St. Jude's ████████████████████████

"are not meaningful in the absence of comparative data, such as market share

information."  A25-26.  The Board did not explain why comparative data would be

required, particularly in light of St. Jude's admission of commercial success.  But

in any event, the Board had comparative data before it; it simply refused to

consider it.  Contrary to the Board's assertion (A25-26), Michigan *did* introduce

"market share information" through exhibits and cross-examination.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  A2030:25-2034:23 ████████████████

Michigan also introduced St. Jude's sales data as reported by IMS.  *See*

A1927-1936. ████████████████████████████

████████████████  A1935. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████  A1936.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



████████████████████████████████████████ *Id.* ██████████

████████████████████████████████ *Id.*

The Board refused to consider the evidence of ██████████

████████████████████, and its two reasons for doing so do not withstand

scrutiny.  *First*, the Board asserted that, at the oral hearing, Michigan's counsel

"conceded that the sales numbers in a vacuum do not tell the Board anything

regarding commercial success."  A26 (citing A2490-2491).  That mischaracterizes

the exchange; counsel was clear that Michigan never relied on sales figures "in a

vacuum" and immediately proceeded to discuss further "evidence of nexus,"

including St. Jude's own marketing materials touting the patented invention and

the exhibits and cross-examination testimony discussed above, all of which the

Board ignored.  A2490-2491.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

*Second*, rather than address Michigan's evidence of market share and nexus, the Board simply asserted that the "final written Decision does not rely on the IMS data [A1865-1936], or any of the portions of the cross-examination testimony [A1692-1704(Butcher); A1834-1838(Lytle); A1856-1864(Lien)]." A31. The Board did not explain ***why*** it did not rely on that evidence; although St. Jude had tried to exclude it, the Board did not grant St. Jude's motion, so the evidence was properly of record and should have been considered. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) ("It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included" (internal quotation marks omitted)). The Board erred by refusing to notice Michigan's proffered evidence of comparative market share data, then ruling against Michigan for supposedly failing to establish comparative market share. *See id.* at 1083 (reversing finding of obviousness; district court wrongly concluded that record did not contain expert testimony on an objective indicium); *Berman v. Dep't of Interior*, 447 F. App'x 186, 194 (Fed. Cir. 2011) (vacating administrative decision; "Board failed to discuss in [its] Initial Decision" relevant record evidence but "instead placed great weight on [the] failure" to obtain that evidence).

**2.   The Board erred in finding no nexus between the commercial success of the Epic and Trifecta products and the claimed invention**

Moreover, the Board's substantive ruling that Michigan did not establish the requisite nexus for commercial success should also be reversed.  The Board's ruling rested on two bases, both of which were legally improper.

*First*, the Board cast aside Michigan's data comparing the pricing and sales of St. Jude's Epic product (which employed the patented treatment) to the pricing and sales of St. Jude's Biocor product (which did not).  A26.  The Board ruled, as a blanket matter, that "[c]omparative product sales within a company … cannot provide the evidence of commercial success that could be obtained by comparing competing products marketed by different companies."  *Id*.

The Board cited no authority for its proposition, and this case shows exactly why its proposition is wrong.  St. Jude's Epic and Biocor products are ***identical in every respect but the claimed invention***.  A902-904.  The comparison between Epic and Biocor is thus perhaps the clearest possible evidence of nexus: St. Jude itself identified the patented anticalcification treatment as the ***only*** variable differentiating Epic from Biocor, and essentially created its own controlled environment for showing that Epic's success stems from "the merits of the claimed invention as opposed to … other extrinsic factors."  *In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011).  Indeed, the patented invention's effect on

market share ███████████████████████████████

███████████████████████████████████

██████████████████████████████.

This Court has previously recognized the utility of comparing products made by the same company. In *Transocean*, the patent owner presented evidence of commercial success by comparing its (patented) dual-activity drilling rig and its (unpatented) single-activity drilling rig. 699 F.3d at 1350. The patent owner demonstrated that it charged a 12% premium for the patented product, that some customers expressly required dual-activity rigs, and that dual-activity rigs account for an increasing percentage of the rigs sold. *Id.* Rather than dismissing this comparative evidence, this Court ***reversed*** an invalidity judgment and held that "[the patent owner's] dual-activity rigs have been a commercial success and that this success has a nexus to the features claimed in the patents." *Id*. There is no legal basis for the Board's ruling that comparative product sales cannot provide a nexus for commercial success simply because the products are sold by the same company.

*Second*, the Board stated that Michigan's reliance on St. Jude's marketing materials only created "an inference of a nexus," not a nexus itself. A27. This reflects a legal error regarding allocation of the burden of proof of commercial success, which follows a burden-shifting scheme. The patentee first must establish

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

a prima facie case of nexus between commercial success and the patented

invention, which can be done by showing that a product or process is commercially

successful and employs the patented invention; the burden then shifts to the

challenger to show that the success is due to factors other than the patented

invention. *Demaco*, 851 F.2d at 1392-1394.

Michigan clearly made out a prima facie case of nexus: St. Jude's

promotional materials highlight the "identical" design of the Biocor product to the

Epic valve and emphasize the incorporation of the patented technology "to protect

against tissue mineralization, or hardening" (A902-904), and the patented

treatment satisfied a competitive need of St. Jude.  A1409(¶31)(Lien).  This Court

has found that similar evidence satisfies the prima facie requirement.  *See*

*Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1344 (Fed. Cir. 2011)

(substantial evidence supported nonobviousness where patented invention was

described as "superior" and "advanced technology," with "cutting capabilities and

precision not attainable" by prior system); *Rolls-Royce, PLC v. United Techs.*

*Corp.*, 603 F.3d 1325, 1340 (Fed. Cir. 2010) (patent owner established nexus

where patented fan-blade design was "strongly marketed[,]" and the improved

efficiency and noise characteristics of the fan blade were a "major driving force"

behind engine sales); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350-

1351 (Fed. Cir. 2000) (patentee's prima facie case may consist of evidence that

customers will pay more for the device containing the patented invention than for one that does not).

The Board should therefore have shifted the burden to St. Jude to prove that the commercial success of the Epic and Trifecta valves was due to "extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Demaco*, 851 F.2d at 1393; *see also Winner*, 202 F.3d at 1351. The Board did not do that. Instead, it was satisfied by speculative statements unsupported by evidence, such as its assertion that the success of St. Jude's products "***may be*** due to marketing choices by St. Jude." A26 (emphasis added). St. Jude proffered no evidence of any "marketing choices" supposedly responsible for Epic's overwhelming success, and Michigan was not required to show that "commercial success of the patented invention is *not* due to factors other than the patented invention." *Demaco*, 851 F.2d at 1394.

Nor did St. Jude's witnesses testify (beyond bare assertion) that the Epic and Trifecta valves' commercial success was due to anything other than the patented invention. While St. Jude's witness Mr. Lien asserted that other features—like durability, hemodynamics, and mechanical improvements—factored into doctors' purchasing decisions more heavily than any particular anticalcification treatment (A1404-1406(¶¶20-24)), he had no foundation or basis for this testimony other than a March 20, 2007 survey, which was conducted ***before*** Epic was on the U.S.

market. Nor did he claim that Biocor and Epic—which he acknowledged are "virtually identical" except for the patented invention (A1400-1401(¶15))—meaningfully differed in these regards. Michigan's prima facie evidence of a nexus cannot be overcome by one witness's mere "argument and conjecture." *Demaco*, 851 F.2d at 1393.

Similarly, while Dr. Lytle had no ***personal*** preference for using valves with an anticalcification treatment as opposed to valves without (A1843(10:1-10)), his individual preference is irrelevant, especially in light of sales evidence showing that his views are not representative. The ***market*** has a clear preference for Epic (A901; A1936), and ████████████████████████████

████████████████████████████████████████

████████████████████████    A902; A1936; *see Winner*, 202 F.3d at 1350-1351.

Although "many market forces unrelated to the inventiveness of the patent may influence commercial success," a challenger faced with a prima facie case of nexus like Michigan's "must make a convincing case that those market forces indeed were the likely cause of the success." *Crocs*, 598 F.3d at 1311. It is not enough simply to point to other speculative causes without evidentiary support. *See Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000) (district court erred in finding operator of nuclear generating station

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

established that success of patentee's invention was due to factors extraneous to the patented invention).  The Board committed legal error by failing to put St. Jude to its proof.

## III. THE BOARD INCORRECTLY DETERMINED THAT COMBINATIONS OF PRIOR ART RENDER THE ASSERTED CLAIMS OBVIOUS

The Board's errors regarding objective indicia of nonobviousness are independently sufficient to set aside the Board's obviousness determination.  Those errors only gain greater prominence due to St. Jude's weak obviousness assertions.

### A. A Skilled Artisan Would Not Have Combined Carpentier, Kaplan, And Gong

There was insufficient evidence to support the Board's findings of a motivation to combine Carpentier, Kaplan, and Gong, and of a reasonable expectation of success in making the combination.  The Board enumerated Michigan's claim elements and indicated that they "are taught by one or more of Carpentier, Kaplan, and Gong."  A20.  But "[a] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).  Rather, an obviousness finding must be rooted in some teaching or incentive supporting a claimed combination (*In re Bond*, 910 F.2d 831, 834 (Fed. Cir. 1990)), and there must be, at the time of the invention, "a reasonable expectation of success in applying [the prior art's] teachings" (*Life Technologies,*

*Inc. v. Clontech Laboratories, Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000)).  Neither of those requirements is met here, especially because two of the asserted references—Carpentier and Gong—actually teach away from the patented invention.

### 1. There is no substantial evidence of a motivation to combine Carpentier, Kaplan, and Gong

#### a. *No reason to combine was offered by St. Jude or explained by the Board*

St. Jude offered ***no evidence at all*** for a motivation to combine Carpentier, Kaplan, and Gong; the only record evidence regarding this combination was from Dr. Schoen, who concluded that "[a] person skilled in the art would have no reason to combine these references."  A660-661(¶64).  The Board's entire discussion of this combination is focused on rejecting two arguments ***made by Michigan***.  A21-22.  No affirmative reason to combine is given or explained.  That was error.

The Supreme Court has emphasized the importance of showing "a reason" for combining the elements in the manner claimed.  *KSR*, 550 U.S. at 418.  Importantly, the analysis leading to the "apparent reason to combine" "should be made explicit."  *Id.*; *see also Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008) ("some kind of motivation ***must be shown*** from some source [to] understand why a [skilled artisan] would have thought of either combining two or more references or modifying one to achieve the patented method" (emphasis

added)); *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 619 F.3d 1329, 1336-1337 (Fed. Cir. 2010) ("Teva points to no evidence from before the time of invention that would teach, suggest, or motivate or supply any common sense reason for a person of ordinary skill in the art to … routinely, simply, or easily arrive at the inventive result.").

The Board's failure to identify any actual motivation to combine Carpentier, Kaplan, and Gong is ultimately not surprising; the record "lacks the necessary substantial evidence to support a rejection of the … claims." *Kotzab*, 217 F.3d at 1370. Carpentier teaches a method of impregnating tissue with ***metal ions*** (not treatment with alcohol) to reduce calcification. *E.g.*, A165(2:12-16) ("In accordance with the present invention, a calcification-resistant bioprosthetic implant comprises a tanned biological material, which is impregnated with a ***calcification-inhibiting amount of ferric or stannic ions*** or a mixture thereof." (emphasis added)). While the material had been stored in a glycerol solution contaminated with metal ions, nothing in Carpentier suggests that the glycerol solution (or any other alcohol) has anticalcification effects; on the contrary, Carpentier teaches that iron and tin ions were required to provide an anticalcification effect, using commercial glycerol as a control. A167(6:19-22); A168(8:3-5); A644-655(¶36); *see infra* pp. 54-58. Thus, skilled artisans reading Carpentier would not have been motivated to investigate other disclosures of

anticalcification using glycerol—if anything, they would have been led away from using alcohol without metal ions and instead focused on ion-based treatment. A660-661(¶64).

There is also no motivation to combine Carpentier's anticalcification treatment with Kaplan or Gong. *Id*. Kaplan teaches a method of storing tissue, not methods for treating bioprosthetic tissue, and is directed to development of a small-diameter biologic prosthesis for use in coronary artery bypass surgery. A236. Kaplan determined that vascular tissue stored in ethanol was advantageous for shelf-life, reporting that grafts stored in ethanol demonstrated "[s]tability of the configuration and structure of the vessel wall and flow surface" for up to two years of storage. A243. But Kaplan did not make any observations concerning *calcification* over long storage periods. Kaplan's only discussion of calcification involved observation after just three weeks' implantation in dogs, in which it was reported that: "Calcification was detected in *some* grafts stored in 0.65% [glutaraldehyde] … This phenomenon was not seen in the vessels stored in ethyl alcohol." A243 (emphasis added).

The Board believed that this brief passage in Kaplan provided a "sufficient suggestion" that ethanol had anticalcification properties for a skilled artisan to investigate combining Carpentier's treatment method with the use of ethanol. A22. But the Board did not explain why it viewed such a "suggestion" as "sufficient"—

especially in light of Kaplan's failure to disclose any meaningful anticalcification information. As Dr. Schoen explained, Kaplan never states that ethanol has an anticalcification effect (A647(¶42)), and the Board cannot find obviousness by arguing that a reference discloses a fact on which it is silent. *In re Evanega*, 829 F.2d 1110, 1112 (Fed. Cir. 1987) ("the mere absence of an explicit requirement" in a reference "cannot reasonably be construed as an affirmative statement" concerning that requirement). The Board chose a single, cursory line in Kaplan and extrapolated from it the unsupported conclusion that Kaplan taught that ethanol had anticalcification effects. That was error, especially given Dr. Schoen's detailed testimony that Kaplan teaches nothing of the sort. A653(¶52); *see Bausch & Lomb v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986). The Board may not use the claims as a road map, picking and choosing among the individual parts of assorted prior art references "as a mosaic to recreate a facsimile of the claimed invention." *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1552 (Fed. Cir. 1983).

Most importantly—to the extent a skilled artisan would have relied upon any of Kaplan's teachings at all—although Kaplan observed calcification in "some" grafts stored in glutaraldehyde and not in other grafts stored in ethanol (A647(¶42)), the reference **as a whole** shows a skilled artisan that the lack of calcification in the latter category resulted from factors unrelated to the use of

alcohol. Dr. Schoen pointed out many such reasons, though the Board did not properly consider them. *First*, Kaplan tested for calcification a mere three weeks after implantation—too brief a period for meaningful observations concerning calcification. A649-650(¶45). *Second*, Kaplan used dogs as a test model; a skilled artisan would know that tissue implanted in dogs does not reliably calcify and would not rely on observations made in dog studies. A635-636(¶21). *Third*, even in cases where early calcification is observed, it can be a result of external factors, including infection or thrombosis (A1846(24:3-13)), or damage to the tissue during implantation (A1275-1278), which were not excluded by Kaplan. Moreover, Kaplan's cursory statement of detection of calcification in "some" grafts is vague and not supported by scientific detail. A646-647(¶41).

Given the Board's admission that Dr. Schoen's criticisms of Kaplan were "not wholly without merit" (A14), its unexplained conclusion that Kaplan's disclosure was "sufficient" cannot justify invalidating issued patent claims. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (testimony that skilled artisan "would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references" is insufficient to prove obviousness and is "fraught with hindsight bias").

Gong, for its part, is directed to evaluating whether aldehydes cause calcification of tissues, and used glycerol as an alternative to glutaraldehyde for use in fixing (or tanning) tissues.  A462; A654(¶55).  Specifically, Gong compared the calcification of tissue treated in glycerol and glutaraldehyde or formaldehyde to tissue treated in glycerol only and to tissue treated in glutaraldehyde and formaldehyde only.  A462.  Each of the tissues treated in both glycerol and an aldehyde (glutaraldehyde or formaldehyde) resulted in significant calcification (A463(Table 1, Groups B-D)), and in fact exhibited *increased* calcification as compared to a glutaraldehyde and formaldehyde only treated tissue (A464(Figure 2)).  *See* A656-657(¶58).  As explained by Dr. Schoen without rebuttal, Gong's reported data suggests that the addition of glycerol to a glutaraldehyde treatment increases calcification and thus teaches away from the claimed invention.  *Id.*; *see also infra* pp. 54-58.

The Board was not free to disregard the specific teachings of this prior art and draw an unsupported conclusion that a skilled artisan would have been motivated to combine unrelated disclosures directed toward discrete and separate objectives, simply because each involves alcohol.  Indeed, the only reason to combine the references would be to produce anticalcification benefits, yet none of the references discloses that alcohol would have such an effect.  *See Leo Pharm.*,

726 F.3d at 1353-1356 (reversing Board's finding of motivation to combine where prior art taught "divergent compositions").

> **b.    The record does not support modifying Carpentier to include a rinsing step**

There is no expert testimony to support the Board's suggestion that the claimed invention is merely Carpentier's teachings plus Kaplan's rinsing step. A22 (finding that "[t]here is no reason to modify Carpentier to remove the ion treatment in order to arrive at the claims; the only modification that is required is the inclusion of the rinsing step of Kaplan"). The only record evidence regarding combining these references is from Dr. Schoen, who opined that a skilled artisan would not have combined Carpentier with either Kaplan or Gong (A660-661(¶64)), and the Board fails to cite any contrary evidence. The Board raised this issue during the final hearing, whereupon Michigan argued that rinsing was not an obvious step, as "there could be a concern that the rinsing could take away any … effect of the treatment [and] could cause … too much of the ethanol to be removed [or] could cause further calcification or other complication." A2520:10-2521:17. The Board's decision then referenced supposed "unchallenged testimony" that a rinsing step "was conventional." A22. The referenced testimony is from Dr. Kaplan—neither an expert in anticalcification methods (A826(32:10-12)) nor a skilled artisan (A850(126:18-127:6))—who stated that a skilled artisan "would not only conduct a rinsing step prior to any surgical procedure, but would not proceed

to do so without conducting such a step." A254-255(¶19). But Carpentier

references rinsing only prior to treatment (A167(6:28-34)), and there is simply no

suggestion that a skilled artisan would be motivated to rinse off the aluminum ions.

Kaplan, for its part, only generally indicates that the tissue was rinsed after storage

and prior to implantation (A239-240), and the tissue in Kaplan was not treated with

an ion-containing anticalcification treatment as in Carpentier. St. Jude provided no

evidence at all that a skilled artisan would be motivated to combine Kaplan's

general teaching that stored, non-anticalcification treated tissue can be rinsed prior

to implantation with Carpentier's teaching of an ion-treated tissue and maintain its

resistance to calcification.

Moreover, the Board's suggestion that the claimed invention is merely

Carpentier's teachings plus Kaplan's rinsing step is manifestly incorrect as to

dependent claim 25. Claim 25 adds the use of a 50% or greater concentration of a

single alcohol, ethanol.[7] For claim 25, therefore, the Board drew from Kaplan not

only a rinsing step, but also its teaching "of treatment with a 50% ethanol

solution." A21. But Kaplan does not suggest an ***anticalcification*** treatment with a

50% ethanol solution (A653(¶52)), and the Board articulated no reason to convert

---

[7] The Board's construction of the phrase "at least about 50% by volume of a water soluble C1-C3 aliphatic alcohol," to mean "one or more water-soluble C1-C3 aliphatic alcohols" does not apply to claim 25, which requires that "***the*** alcohol is ethanol." A54(15:22-23).

the "up to 30% ethanol" in Carpentier to the 50% ethanol solution used in Kaplan. A54(15:13-23). Indeed, Carpentier's upper bound on ethanol concentration—"*up to*" 30%—means that ethanol concentration was purposefully limited. A167(5:18-22). The Board never explained why a skilled artisan would have changed the 30% ethanol in Carpentier to the 50% ethanol of Kaplan to produce claim 25.

### 2.    A skilled artisan would not have reasonably expected success in combining Carpentier, Kaplan, and Gong

Without making any findings and without citing any prior art, the Board concluded that it "was not persuaded" that a skilled artisan "would have *not* expected success" in combining Carpentier, Kaplan, and Gong. A23 (emphasis added). That was error, as the Board was required to find, *based on the prior art itself*, that a skilled artisan *would have* expected success. *See In re Vaeck*, 947 F.2d 488, 493 (Fed. Cir. 1991) ("Where claimed subject matter has been rejected as obvious in view of a combination of prior art references, a proper analysis under § 103 requires … consideration of … whether … those of ordinary skill *would have* a reasonable expectation of success. … [T]he reasonable expectation of success must be founded in the prior art." (emphasis added)).

Moreover, the Board's conclusion is not supported by substantial evidence. Again, Dr. Schoen provided the sole expert opinion on the point, and he explained that there would be no reasonable expectation of success in combining these references because Kaplan and Gong do not recognize any anticalcification effects

of any alcohol (including ethanol and glycerol), and none of the references teaches using any alcohol for anticalcification purposes.  A660-661(¶64).  The Board's disregard of this single and uncontroverted expert opinion requires reversal.  *Leo Pharm.*, 726 F.3d at 1357.

### 3. The prior art taught away from combining Carpentier, Kaplan, and Gong

The Board's ruling that Carpentier and Gong do not teach away from the claimed invention depended on a legal error: the Board's view that prior art references cannot teach away unless they disclose (and discourage) methods "within the scope of the claims."  A18; A19-20.  When viewed without the distorted lens the Board applied, it is clear that Carpentier and Gong teach away from the patented method.

"A prior art reference may be considered to teach away when 'a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'"  *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 885 (Fed. Cir. 1998) (quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)); *see also In re Haruna*, 249 F.3d 1327, 1335 (Fed. Cir. 2001).  "An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements."  *DePuy Spine, Inc. v.*

*Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009); *see also United States v. Adams*, 383 U.S. 39, 52 (1966) (upholding nonobviousness where references would "deter any investigation into [the claimed] combination").

However, the Board's holding that references cannot teach away simply because they do not disclose the precise invention claimed in the patent-in-suit is unsupported. *See Winner*, 202 F.3d at 1350 (rejecting argument that prior art could not teach away from using a "ratcheting mechanism" simply because it did not use one itself). The Board's position would mean that a prior art reference could only teach away from a claimed invention if it in fact ***anticipated*** the invention, which would vitiate the doctrine of teaching away. Moreover, the Board's particular conclusion is self-contradictory: Carpentier and Gong cannot be so far removed from "the scope of the claims" for purposes of teaching away (A18-20), yet teach "all elements of [the] claims" for purposes of the asserted combinations (A20). The Board cannot have it both ways.

When viewed under the proper standard, both Carpentier and Gong teach away from using an alcohol treatment to combat calcification. Carpentier concluded that glycerol contaminated with iron and tin ions was required for calcification mitigation. A167(6:17-22); *see also* A168(8:3-5) (clean or "commercial glycerol" lacking a high concentration of iron and tin ions did ***not*** provide the anticalcification benefit of ion-contaminated glycerol). This disclosure

- 55 -

steers a skilled artisan *away* from the claimed invention, as Dr. Schoen explained without contradiction. A644-645(¶¶36-37); A660-662(¶¶63-65); *see Crocs*, 598 F.3d at 1308-1310 (reversing ITC's obviousness decision; prior art taught that "friction was a problem, not a benefit" and therefore "did not include any hint or suggestion or even common sense reason to include the [patented technology]").

The Board interpreted Carpentier's conclusions to mean that clean commercial glycerol did not provide "*as much* calcification mitigation as [contaminated] glycerol, not that commercial glycerol provides *no* calcification mitigation." A18. That interpretation is based on a misunderstanding of Carpentier. As Dr. Schoen explained, again without contradiction, Carpentier concluded that stannic or ferric ions *must be added* to clean glycerol to see *any* positive anticalcification effect. A167(6:21-22) ("the providers of this calcification mitigation were ferric and stannic ions"); A168(8:3-5) ("commercial glycerol … does not provide the calcification mitigation as does [the ion-contaminated glycerol]"); A168(8:17-20) ("treatment 5" involving ferric oxide and clean glycerol "did not provide for calcification mitigation"); A644-645(¶36) (opining that Carpentier teaches "commercial glycerol solution (aaa$_C$), which was free of stannic or ferric ions, did not provide a calcification mitigation effect"). Carpentier therefore instructs that alcohol *does not* have an anticalcification effect in

glutaraldehyde pretreated materials, and thus teaches away from Michigan's claimed method.

Properly considered, Gong also teaches away. Gong's tables 2, 3, and 4 show that treating valves with glycerol before treatment with an aldehyde does not prevent calcification. A464; A656-657(¶58). Rather, these results confirm that glutaraldehyde causes calcification and teach that adding glycerol to glutaraldehyde pretreatment results in *more*, not less, calcification—thereby teaching away from using glycerol to fight calcification, as Dr. Schoen explained (again without contradiction). A656-657(¶58); A462; *see also Mentor H/S Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1377 (Fed. Cir. 2001) (reversing district court's grant of a new trial on obviousness where prior art reference taught away from claimed method); *Haruna*, 249 F.3d at 1335-1336 (reversing finding of obviousness; "[the Board's] determination ignores the teachings [of the prior art] that discourage … the claimed design"); *Ecolochem*, 227 F.3d at 1379 (reversing finding of obviousness; prior art "warned against [the patented process] because of the carbon contaminants" (internal quotation marks omitted)).

The Board's contrary conclusion regarding Gong rested on its assertion that "it is impossible to tell … whether the difference in calcification … exists because glycerol increases calcification, or because formaldehyde decreases it." A20. That is directly contradicted by Gong itself, which expressly teaches that aldehydes

(such as formaldehyde) *cause* calcification, not that they decrease calcification. A462 ("Aldehyde tanning [is] the villain in bioprosthetic calcification."); A465 ("Both glutaraldehyde and formaldehyde … may induce calcification."); *see also* A656-657(¶58) (explaining that Gong teaches a skilled artisan that "tissue treated in both glycerol and [glutaraldehyde] exhibited *increased* calcification as compared to a [glutaraldehyde]/formaldehyde-only treated tissue").

The Board committed legal error in the standard it applied to determining whether Carpentier and Gong teach away. There is also no substantial evidence supporting the Board's interpretations of Carpentier and Gong, which are inconsistent with the unrebutted expert opinion of record. The Board's findings should be reversed.

### B.    A Skilled Artisan Would Not Have Combined Levy 1992, Holman, And Kaplan

As with the combination of Carpentier, Kaplan, and Gong, there was insufficient evidence to support the Board's findings of a motivation to combine Levy 1992, Kaplan, and Holman, or of a reasonable expectation of success in making the combination. This is especially true in light of the prior art that teaches away from the claimed invention.

### 1.    There is no substantial evidence of a motivation to combine Levy 1992, Holman, and Kaplan

Once again, St. Jude offered ***no evidence at all*** for a motivation to combine Levy 1992, Kaplan, and Holman, and the only evidence on the point is Dr. Schoen's.  A659-660(¶¶60-62).  Nevertheless, the Board concluded that a skilled artisan would have combined the disclosure of  Levy 1992, which it found used isopropanol as a solvent for metal ions, with the 50% ethanol discussed in Kaplan or the 70% ethanol discussed in Holman.  A14-16.  The Board offered two potential reasons for such a combination, but neither is supported by the record.

The Board's primary reason for combining Levy 1992, Kaplan, and Holman was its erroneous conclusion that Kaplan teaches "the potential anticalcification effects of ethanol[.]"  A14-15.  The Board drew this conclusion notwithstanding its own acknowledgment that there were "faults [with] the Kaplan experiment" and its recognition that Dr. Schoen's criticisms of Kaplan (*see supra* pp. 15-17)—ranging from the unreasonableness of Kaplan's observations regarding calcification, the inappropriateness of the dog model used and the three-week testing period, the omission of necessary information concerning the experiments, and the failure to report quantitative or qualitative data—were "not wholly without merit."  A14. Yet the Board disregarded these concerns (without citing evidence) and found that a skilled artisan would be motivated to combine Levy 1992's anticalcification treatments with Kaplan's use of 50% ethanol.  For the reasons explained above

(pp. 15-17, 48-49), a skilled artisan looking to improve anticalcification in bioprosthetic tissue would not have looked to Kaplan, and would certainly not have seen in Kaplan a reason to combine existing treatment methods using metal ions with an alcohol treatment.  Had Kaplan truly taught in 1985 that ethanol had anticalcification effects, later publications like Carpentier (1989), Gong (1991), and Levy 1992, which continued to investigate anticalcification solutions, would not have needed to do so, yet they raised such a need specifically.  A464 ("Calcification of bioprosthetic cardiac valves is still a great challenge to investigators and cardiac surgeons."); A147(1:32-35) ("Calcification, however, has emerged as the most frequent cause of clinical failure of bioprosthetic heart valves fabricated from porcine aortic valves or bovine pericardium.").

The Board's second reason to combine Levy 1992, Kaplan, and Holman was that the "close structural and functional similarity of the isopropanol of Levy … to the ethanol of Kaplan and Holman suggests … that the two alcohols could be used interchangeably."  A15.  The Board found that a skilled artisan "would have had reason to use the 50% ethanol of Kaplan as a storage medium, or the 70% ethanol of Holman as a sterilant, in place of the isopropanol of Levy, which also acts as a storage medium or sterilant," and that "[t]his modification would have resulted in the claimed invention."  A15-16.

But simply asserting such similarities, particularly because they are not based on facts in evidence, does nothing to demonstrate how or why a skilled artisan would be ***motivated*** to swap Levy 1992's isopropanol for Kaplan's or Holman's more concentrated ethanol. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383 (Fed. Cir. 1986) ("Focusing on the obviousness of substitutions and differences instead of on the invention as a whole … was a legally improper way to simplify the difficult determination of obviousness."); *see Leo Pharm.*, 726 F.3d at 1356. The Board's conclusion relies on an unsupported assertion that isopropanol and ethanol must be interchangeable because they are both C1-C3 aliphatic alcohols. But neither St. Jude nor the Board pointed to any evidence that it would be obvious to switch not only the ***type*** of alcohol in Levy 1992 but also its specific ***concentration*** to produce anticalcification benefits, simply because (1) Kaplan disclosed ***storing*** tissue in ethanol, or (2) Holman disclosed ***dehydrating*** and ***sterilizing*** tissues using ethanol before glutaraldehyde fixation.

The Board's conclusion regarding swapping the alcohols also belies the fact, explained by Dr. Schoen without rebuttal, that each reference uses the alcohol for significantly different purposes, and ***none*** teaches using alcohol for anticalcification purposes. A659-660(¶61). The Board is wrong to say that Levy 1992 used isopropanol as a "storage medium or sterilant." A15-16. Rather, Levy

1992 references isopropanol in passing as being "within the contemplation of the invention" as an organic *solvent* for the metal cations in the anticalcification treatment. A148(4:15-21). Nothing in Levy 1992 suggests an isopropanol level of at least 50% (A642-643(¶33)), and any suggestion regarding alcohol concentration would relate to its known purpose as a solvent—not as an anticalcification agent. The treatment solution in Levy 1992 provides an anticalcification effect through the use of trivalent aluminum, with the treatment lasting only 24 hours. A148(4:5-11). Kaplan, by contrast, discloses 50% ethanol as a ***long-term storage*** medium (up to 2 years) for glutaraldehyde-fixated canine carotid arteries, which is irrelevant to a treatment lasting only 24 hours as Levy 1992 does. A237. And Kaplan does not teach treating tissue with alcohol after glutaraldehyde fixation and prior to storage or implantation. A239. Holman, for its part, teaches using ethanol as a sterilant to make animal tissue more suitable for human implantation, and only teaches that it is appropriate to subject tissue to higher concentrations of ethanol (70% and up) when the tissue has been previously dehydrated. A305(2:35-40; 44-50). Holman does not teach treating glutaraldehyde-fixed tissue with alcohol prior to storage or implantation, and it does not say anything about calcification at all. A659-660(¶61). As Dr. Schoen explained without contradiction, the mere fact that each reference discloses the use of a C1-C3 alcohol does not motivate a skilled artisan to combine the references to produce the '775 patent. A659-660(¶¶60-62).

### 2.    A skilled artisan would not have reasonably expected success in combining Levy 1992, Holman, and Kaplan

The Board cited nothing supporting its conclusion that a skilled artisan would have expected success in combining Levy 1992, Holman, and Kaplan. Rather, the Board simply stated that there was no "evidence that [a skilled] artisan would have expected such an incorporation to be *unsuccessful*." A16 (emphasis added). Of course, a lack of evidence of an expectation of *failure* does not amount to evidence of a reasonable expectation of *success*. *See Cyclobenzaprine*, 676 F.3d at 1070 (reversing invalidity judgment where record lacked evidence that a skilled artisan would have had a reasonable expectation of success in creating a therapeutically effective treatment).

The record affirmatively shows that a skilled artisan would *not* have expected success in combining Levy 1992, Kaplan, and Holman. Dr. Schoen explained, without contradiction, that there would be no reasonable expectation of success in combining references that do not teach the use of ethanol or any alcohol for anticalcification purposes. A659-660(¶61). The Board rejected this argument because it believed anticalcification was not a claim limitation, but it did not explain how or why a skilled artisan would expect success in making the combination for any purpose other than anticalcification. The Board's ruling is unsupported and requires reversal. *See Eli Lilly & Co.*, 619 F.3d at 1338 (skilled artisan would not have had a reasonable expectation of success in treating

osteoporosis with claimed invention); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009) (rejecting obviousness challenge in light of expert testimony that a skilled artisan would not have reasonably expected success in isolating certain proteins using recombinant DNA technology, and where challenger could "point[] to no prior art reference or testimony that demonstrates that [a skilled artisan] would have reasonably expected [success]").

### 3. The prior art taught away from combining Levy 1992, Holman, and Kaplan

As demonstrated above (pp. 54-58), the prior art as a whole—notably Carpentier and Gong—teaches away from using concentrated alcohols in an anticalcification solution.  Carpentier teaches that uncontaminated glycerol by itself has no anticalcification effect (A644-645(¶¶36-37), and Gong teaches that alcohols can *increase* calcification when used in connection with aldehyde treatment, as compared to an aldehyde treatment alone (A656-657(¶58)).  Viewing these teachings in light of Levy 1992—which recommends the use of an aqueous solution and discloses that organic solvents (such as isopropanol) can have "deleterious effects on biologically-based tissue" and could have "toxic effects" once implanted—a skilled artisan would be led away from increasing the alcohol concentration of Levy 1992 to the levels used for other purposes by Kaplan and Holman.

## IV.    THE PREAMBLE IS LIMITING

Following expiration of the '775 patent in May 2015, the claims should be interpreted in accordance with *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-1314 (Fed. Cir. 2005), rather than the broadest reasonable interpretation standard used below. *See Facebook, Inc. v. Pragmatus AV, LLC*, Nos. 2013-1350, 2013-1351, 2014 WL 4454956, at *2-4 (Fed. Cir. Sept. 11, 2014) (non-precedential).  The phrase "calcification-resistant biomaterial" in the preamble "give[s] life, meaning, and vitality to the claim" because it describes a fundamental characteristic of the claimed invention, namely resistance to calcification. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999); *see Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1357-1358 (Fed. Cir. 2012).  The specification makes clear that using alcohol to render biomaterial resistant to calcification is not only advantageous, but distinguishes the claimed invention from the prior art. A47(2:59-67).  That key limitation also appears in the patent's title (A40), background of the invention (A47(1:24-28)), and detailed description (A49(6:50-52)). *See Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).  Properly limiting the claims provides a further reason why the obviousness finding cannot stand: none of the references upon which the Board relied discloses or suggests using alcohol treatment to render biomaterial resistant to calcification.  A2508:10-2510:2.

## CONCLUSION

The Board's final written decision should be reversed or, alternatively, vacated and remanded.

Respectfully submitted,

/s/ William F. Lee

ROBERT M. GERSTEIN
MICHAEL R. WEINER
JENNIFER BURNETTE
MARSHALL, GERSTEIN & BORUN LLP
6300 Willis Tower
233 S. Wacker Dr.
Chicago, IL  60606
(312) 474-6300

WILLIAM F. LEE
MARK C. FLEMING
LISA J. PIROZZOLO
TASHA J. BAHAL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Counsel for Appellant The Regents of the University of Michigan*

November 12, 2014

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Final Written Decision 35 U.S.C. § 318 and 37 C.F.R. § 42.73,
    Paper No. 69 (May 1, 2014) ....................................................A1-A35 (TAB 1)

U.S. Patent No. 5,746,775, issued May 5, 1998 ...........................A39-A54 (TAB 2)

# TAB 1

Trials@uspto.gov
571-272-7822
Paper 69
Entered: May 1, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.,
Petitioner,

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,
Patent Owner.

————————

Case IPR2013-00041
Patent No. 5,746,775

————————

Before MICHAEL J. FITZPATRICK, RAMA G. ELLURU, and
CHRISTOPHER L. CRUMBLEY, *Administrative Patent Judges.*

CRUMBLEY, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. §42.73*

**A1**

IPR2013-00041
Patent No. 5,746,775

# I. BACKGROUND

Petitioner, St. Jude Medical, Cardiology Division Inc. ("St. Jude"), filed a petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 23 and 25-29 of U.S. Patent No. 5,746,775 ("the '775 patent").  Patent Owner, The Board of Regents of the University of Michigan ("Michigan"), did not file a preliminary response.  In a May 2, 2013, Decision to Institute (Paper 12, "Dec."), we granted the petition and instituted trial on the following grounds:

1)    Claims 23 and 25-29 as having been obvious over the combined teachings of Levy[1], Kaplan[2], and Holman[3]; and

2)    Claims 23, 25, 26, 28, and 29 as having been obvious over the combined teachings of Carpentier[4], Kaplan, and Gong[5].

Dec. 15.

Following institution, Michigan filed a response to the petition (Paper 22, "PO Resp."), and St. Jude filed a reply (Paper 29, "Pet. Reply"). Both St. Jude (Paper 42, "Pet. Mot.") and Michigan (Paper 40, "PO Mot.") filed motions to exclude evidence.  We held an oral hearing on January 27, 2014, and a transcript of the oral hearing is included in the record.  Paper 68, "Tr."

Both parties presented witness testimony via declaration.  With its petition, St. Jude provided a declaration from Svetlana Kaplan, Ph.D. (Ex. 1010), one of the authors of the Kaplan reference, as well as a declaration from Paul W. Bohn, Ph.D. (Ex. 1012).  With its response, Michigan presented a declaration from Frederick J.

---

[1] U.S. Patent No. 5,094,661, issued March 10, 1992 (Ex. 1002).

[2] Kaplan et al., *Glutaraldehyde Preparation of Coronary Artery Bypass Bioprostheseses,* 38 J. OF SURGICAL RESEARCH 45-54 (1985) (Ex. 1009).

[3] U.S. Patent No. 4,456,589, issued June 26, 1984 (Ex. 1011).

[4] U.S. Patent No. 5,002,566, issued Mar. 26, 1991 (Ex. 1004).

[5] G. Gong et al., *Aldehyde Tanning: The Villain in Bioprosthetic Calcification,* 5 EURO. J. CARDIOTHORACIC SURG. 288-93 (1991) (Ex. 1015).

**A2**

Schoen, M.D., Ph.D. (Ex. 2000). Finally, along with its reply, St. Jude provided declarations from three additional witnesses: Jonathan T. Butcher (Ex. 1016); Scott Lien (Ex. 1041); and Bruce Lytle, M.D. (Ex. 1065).

We have jurisdiction under 35 U.S.C. § 6(c). This final written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during trial. For the reasons discussed below, we determine that St. Jude has met its burden to prove by a preponderance of the evidence that claims 23 and 25-29 of the '775 patent are unpatentable.

A. *The '775 Patent*

The '775 patent relates to methods of exposing collagenous biomaterial[6] to an alcohol, in order to inhibit in vivo calcification. Ex. 1001, Abstract, 1:23-27. Prior to implantation in a living being, biomaterials typically are "fixed" or "tanned" using glutaraldehyde ("GA"), to stabilize the tissue against degradation. Pet. 4 (citing Ex. 1001, 2:8-30). Tanning, however, is known to make tissue susceptible to calcification, which is accumulation of calcium salts in the tissue. PO Resp. 3 (citing Ex. 2000 ¶ 11-17). "For implanted biomaterials such as a bioprosthetic heart valve, calcification can be a significant problem, sometimes requiring surgical replacement." *Id.*

The '775 patent is directed to the use of alcohol to mitigate or prevent calcification in GA-pretreated tissue. Ex. 1001, 1:23-27. According to the '775 patent, "*[t]he use of alcohols in biomaterial treatment protocols is well-known*, but is typically limited to its use as a solvent and/or sterilizing agent." *Id.* at 2:59-61 (emphasis added). It further states, "there has never been any teaching or suggestion that ethanol has any effect on prevention of pathologic calcification"

---

[6] "Biomaterial" refers to collagenous material that may be derived from different animals, typically a mammalian species. Ex. 1001, 3:33-47.

and that "[i]t would be advantageous to use this well-known compound in existing protocols for rendering bioprosthetic tissue calcification resistant." *Id*. at 2:62-67.

The patent states that the alcohol treatment solution is preferably "an aqueous solution of greater than about 50% alcohol, and preferably between 60% to 80% alcohol by volume." *Id* at 4:31-35. The biomaterial is contacted with the alcohol for a period of time sufficient to render the bioprosthetic tissue resistant to in vivo pathologic calcification, "illustratively, from about 20 minutes . . . to in excess of 96 hours." *Id*. at 4:4-9. In preferred embodiments, the biomaterial that has been treated with alcohol should be rinsed prior to implantation or storage to remove excess alcohol and other deleterious components. *Id*. at 5:5-11. In a further embodiment, the alcohol treatment solution contains one or more additional anticalcification agents, including, but not limited to, a soluble salt of a metallic cation, such as $Al^{+3}$ or $Fe^{+3}$. *Id*. at 5:59-63.

### B. Illustrative Claim

Claim 23, the sole independent claim at issue in this trial, is illustrative of the claimed subject matter and reads as follows:

> 23.    A method of making calcification-resistant biomaterial for use in the interior of a human or animal, the method comprising the steps of:
>
> a)    subjecting glutaraldehyde pre-treated bioprosthetic tissue, wherein the bioprosthetic tissue is a collagenous material derived from a mammalian species selected from the group consisting of bovine pericardium, porcine aortic heart valves, saphenous bypass grafts, aortic homografts, and dura mater, to an aqueous, treatment solution of at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol for a period of time between about 20 minutes and 96 hours; and
>
> b)    rinsing the bioprosthetic tissue.

4

**A4**

## II.  DISCUSSION

### A.  *Claim Construction*

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b).  Under this standard, we construe claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).  However, a patentee may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For purposes of our Decision to Institute, we gave each claim term its broadest reasonable interpretation, as understood by one of ordinary skill in the art and consistent with the specification of the '775 patent.  We expressly construed the claim term *C1-C3 aliphatic alcohol* as covering trihydric alcohols such as glycerol.  Dec. 5-6.  Neither party contested this construction during trial, and we discern no reason to modify it.  *See* PO Resp. 11 (adopting the Board's construction).  Nor did either party raise any additional claim construction issues in their briefs following institution of trial.

5

**A5**

At oral hearing, in response to questioning by the panel, the parties raised two additional claim construction issues not set forth in prior briefing, which we address below.

### 1. *calcification-resistant biomaterial*

First, Michigan contends that the phrase *calcification-resistant biomaterial* in the preamble of claim 23 should be interpreted to be a limitation on the claim and given patentable weight. Tr. 58. We disagree. We will construe a claim term that appears in the preamble of a claim only if it is necessary to "give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (citing *Kropa v. Robie*, 187 F.2d 150, 152 (CCPA 1951)). As the Federal Circuit has noted:

> If [] the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.

*Pitney Bowes*, 182 F.3d at 1305. Upon review of the claim language, we determine that the inclusion of *calcification-resistant biomaterial* in the preamble of claim 23 does nothing more than state a property that necessarily results from performing the claimed method, which is set forth fully in the body of the claim. *See In re Tomlinson*, 363 F.2d 928, 934 (CCPA 1966) (finding preamble that only stated result of claimed process could not distinguish over prior art). We, therefore, do not interpret the preamble as limiting.

6

**A6**

IPR2013-00041
Patent No. 5,746,775

2. *a water-soluble C1-C3 aliphatic alcohol*

Second, the parties disagree whether the claim limitation *at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol* requires that a single alcohol make up at least about 50% by volume of the solution. Michigan argues that the word "a" should be construed as "one":

> MR. WEINER: I think the claim requires 50 percent of C1-C3 alcohol.
> JUDGE CRUMBLEY: So, you think "a" should be construed to mean "one"?
> MR. WEINER: That's right. Now it's a comprising claim which means you can include other materials in the solution, but to satisfy the claim, you have to have at least 50 percent C1-C3 alcohol.

Tr. 30. In other words, in Michigan's view, one type of C1-C3 aliphatic alcohol must make up at least 50% by volume of the solution, even if other C1-C3 aliphatic alcohols are also present. This would exclude solutions comprising, for example, one-third glycerol and one-third ethanol as disclosed in Carpentier. Ex. 1004, 6:38-46.

St. Jude contends that, because claim 23 uses the transitional phrase "comprising," the word "a" should be construed to mean "one or more." Tr. 11 ("because it is a comprising claim and is open . . . a combination could be contemplated as well").

The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1356 (Fed. Cir. 2000). This preference to construe "a" as meaning "one or more" is best described as a rule having extremely limited exceptions. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Only when a patentee evinces a clear intent to limit the meaning of "a"

7

**A7**

IPR2013-00041
Patent No. 5,746,775

to "one" is a narrower construction warranted. *Id.*; *cf. Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) (finding no "hard and fast rule that 'a' always means one or more than one. Instead, we read the limitation in light of the claim and specification to discern its meaning.").

Upon review of the claims and specification of the '775 patent, we discern no intent by the patentee to limit the meaning of "a" to "one." Nor has Michigan presented any evidence of such an intent. The specification does not prohibit the use of more than one alcohol, or imply that the anticalcification effect is achieved only if a single alcohol is used. Rather, the patent discloses that "a mixture of two or more organic solvents may be used in the practice of the invention, provided that the combined volume of the organic solvents is . . . preferably greater than about 50%." Ex. 1001, 4:37-40. The broadest reasonable interpretation of the claim is that *at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol* means "at least about 50% by volume of one or more water-soluble C1-C3 aliphatic alcohols."

### B. *Prior Art References*

Neither party disputes that the following five references at issue in the instituted trial are prior art to the '775 patent.[7]

#### 1. Levy

Levy describes methods for treating GA-pretreated bioprosthetic materials, including the claimed bovine pericardium, porcine aortic valve leaflets, and aortic

---

[7] In our Decision to Institute, we determined that the '775 patent is not entitled to an effective filing date earlier than its actual filing date of October 21, 1993, thereby making Levy (issue date March 10, 1993) prior art under 35 U.S.C. § 102(b) (pre-AIA). Dec. 7-9. Michigan expressly stated that it does not contest this determination. PO Resp. 11.

8

**A8**

homografts, in a trivalent aluminum cation (e.g., $AlCl_3$) aqueous solution to prevent calcification after implantation. Ex. 1002, Abstract, 2:50-52, 4:5-11, 4:25-27; *see* Pet. 20-2. Levy states that organic solvents may be used in its invention and exemplifies the use of isopropanol, a C3 aliphatic alcohol. Ex. 1002, 4:15-21. Levy further teaches incubating the bioprosthetic tissue in the treatment solution for a period of time, "illustratively 24 hours." *Id*. at 4:5-7. In addition, Levy describes washing the bioprosthetic tissue with sterile, deionized water after incubating. *Id*. at 4:11-14. Levy does not specify that the isopropanol solution is "an aqueous solution" of "at least about 50% by volume" of the alcohol, as required by claim 23 of the '775 patent.

2.   Kaplan

Kaplan discloses storing GA-fixated canine carotid arteries in "50% ethyl alcohol," a C2 aliphatic alcohol. Ex. 1009, p. 48. Moreover, we credit the testimony of Dr. Kaplan, St. Jude's declarant and the first named author of the Kaplan article, that a person of ordinary skill in the art would interpret Kaplan's disclosure of "50% ethyl alcohol" to be a 50% solution of ethyl alcohol in water, i.e., an "aqueous solution." Ex. 1010 ¶¶ 9, 14.[8] Kaplan also discloses that prior to implantation, the treated arteries were rinsed using saline. Ex. 1009, p. 49.

3.   Holman

Holman, which is directed to treating animal tissue to make it suitable for implantation in human recipients without rejection or reabsorption, teaches

---

[8] Michigan disputes whether Dr. Kaplan is a person of ordinary skill in the art of anticalcification. *See infra* note 9. Her qualifications in the field of anticalcification aside, we find that Dr. Kaplan is sufficiently qualified to testify to the fact that "50% ethyl alcohol" would be understood as 50% solution of ethyl alcohol in water. In any event, Michigan has not challenged this assertion by Dr. Kaplan.

subjecting biomaterial to an even greater concentration of alcohol than taught by
Kaplan.  Specifically, Holman teaches storing bovine pericardial sac tissue in a
sterilant comprising one part by volume of propylene oxide and 99 parts by volume
of 70% ethanol before implantation.  Ex. 1011, Abstract, 2:45-49, 2:51-57.

### 4.   Carpentier

Carpentier describes methods for making calcification-resistant bioprosthetic
implants from tanned biological materials, wherein tanning includes GA treatment.
Ex. 1004, Abstract, 2:54-56, 2:64-3:3.  The treated biological materials include the
claimed porcine heart valves, bovine pericardium, human dura matter and the like.
*Id.* at 2:59-63.  Carpentier further teaches immersing the biological materials in an
aqueous solution that includes ferric ions.  *Id.* at 4:67-5:5.  The aqueous solution
may include ethanol, glycerol, or mixtures thereof.  *Id.* at 5:12-15.  In addition,
Carpentier describes a specific example wherein porcine aortic heart valve leaflets
are immersed in a commercial grade glycerol solution consisting of 1/3 ethanol
(90%), 1/3 aqueous formaldehyde (prepared by mixing 4 parts 37% formaldehyde
and 6 parts water), and 1/3 pure glycerol.  *Id.* at 6:38-46.  Carpentier also provides
a preferred embodiment wherein the biological material is immersed in the
treatment solution for a period of time ranging from about 24 hours to about 200
hours.  *Id.* at 4:67-5:2.  Carpentier does not teach "rinsing the bioprosthetic tissue,"
as required in the final step of claim 23.

### 5.   Gong

Gong attempts to test the hypothesis that aldehydes such as GA cause
calcification of tissue, especially when compared to tissue that is treated with only
glycerol.  Ex. 1015, p. 288.  Table 1 of Gong discloses several experimental
groups, of which Group A was treated with 99.5% glycerol, whereas Groups B-D

were treated with 99.5% glycerol and then GA or formaldehyde, and Group E was treated with GA and formaldehyde but not glycerol. *Id.* at 289. Figure 2 of Gong compares calcification of samples in Groups A, D, and E, and states that "[v]alves treated with glycerol had a lower incidence of calcification than those treated with glutaraldehyde." *Id.* at 290.

### C. Combination of Levy, Kaplan, and Holman

There does not appear to be any significant dispute between the parties that all elements of claims 23 and 25-29 are taught by one or more of Levy, Kaplan, and Holman. With respect to claim 23, for example, our Decision to Institute found that Levy teaches methods for treating GA-pretreated bioprosthetic materials, including the claimed bovine pericardium, porcine aortic valve leaflets, and aortic homografts. Ex. 1002, Abstract, 2:50-52, 4:5-11, 4:25-27. Levy treats the tissue for a period of time, for example 24 hours, in a solution of isopropanol, which is a C3 aliphatic alcohol. *Id.* at 4:5-7, 4:15-21. Kaplan teaches that GA-pretreated tissue may be treated in 50% ethanol, which is at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol. Ex. 1009, p. 48. Levy teaches rinsing the bioprosthetic tissue after treatment. Ex. 1002, 4:11-14.

Michigan does not challenge any of the foregoing findings from our Decision to Institute, or argue separately any of the limitations of the dependent claims. Rather, Michigan makes several arguments regarding the teachings of the references individually, none of which is persuasive. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981) (attacking references individually not persuasive where unpatentability based on combination of references). For example, Michigan argues that Levy does not disclose a step of subjecting a GA-pretreated bioprosthetic tissue to a treatment solution of at least 50% of a C1-C3 alcohol, as recited in claim 23. PO Resp. 23. This is immaterial, however, because the

ground of unpatentability does not rely on Levy alone as teaching this limitation. Rather, Levy is relied upon for its teaching of, *inter alia*, a treatment solution comprising isopropanol, a C1-C3 alcohol, whereas Kaplan is relied upon for teaching a greater than 50% solution of ethanol.

Similarly, Michigan contends that Holman does not describe methods of making tissues resistant to calcification, or a step of subjecting a GA-pretreated bioprosthetic tissue to a treatment solution of at least 50% of a C1-C3 alcohol. Again, the ground of unpatentability does not rely on Holman for either of these disclosures, but instead for Holman's teaching that GA-pretreated tissue may be treated with a 70% solution of ethanol. Ex. 1011, Abstract, 2:45-49, 2:51-57.

The real dispute between the parties, therefore, is not over what each reference teaches, but rather whether a person of ordinary skill in the art would have had reason to combine the references, and would have had a reasonable expectation of success in doing so. We address these issues below.

### 1. Reason to Combine

Michigan argues that St. Jude has not established that a person of ordinary skill would have had reason to combine Levy, Kaplan, and Holman to arrive at the claimed treatment methods. PO Resp. 44. According to Michigan, Levy is directed to methods of using aluminum ions to make tissue calcification-resistant, Holman addresses the use of ethanol as a sterilant, and Kaplan "mentions calcification in the context of GA storage, but does not provide any meaningful information or reliable data concerning anticalcification treatment of tissues." PO Resp. 43. Given these different purposes, Michigan concludes that a person of ordinary skill in the art would have had no motivation to modify the ion-treatment process of Levy with Kaplan or Holman, to result in a different treatment process that uses alcohol for anticalcification. *Id.*

We disagree that the record does not establish a reason to combine. First, despite Michigan's criticism of the Kaplan reference, we conclude that it would have suggested to a person of ordinary skill in the art that ethanol had anticalcification effects. Second, other reasons to combine are found in the prior art.

### Kaplan Article

As noted above, Levy discloses a method of treating GA-pretreated tissue in a solution that may include isopropanol, but does not give any guidance as to the amount of isopropanol to be used. St. Jude contends that Kaplan, in teaching treatment in an aqueous solution of 50% ethanol, would have suggested to a person of ordinary skill that the isopropanol of Levy could be replaced with the 50% ethanol solution of Kaplan, thus arriving at the method of claim 23. Pet. 34.

A significant portion of Michigan's response is devoted to criticism of the Kaplan article. PO Resp. 25-31. First, Michigan notes that Kaplan compared GA-stored tissue with GA-treated and ethanol-stored tissue, which could lead to the conclusion that GA causes calcification instead of ethanol preventing it. *Id*. at 27. Second, Michigan contends that the dog model used by Kaplan is unsuitable for calcification studies, and that the protocol only implanted tissue for three weeks, too short a period to observe calcification. *Id*. at 27-29. Finally, Kaplan is said to be lacking necessary information about the test protocol and any quantitative data about its results. *Id*. at 29-31. In support of these arguments, Michigan cites the testimony of Dr. Schoen, who states that he considers Kaplan's observation that tissue stored in 50% ethanol exhibits no calcification to be "vague, lack[ing] necessary detail that should be included in a scientific publication, and leaves open many questions." Ex. 2000 ¶¶ 40-41. Michigan concludes that, because of these deficiencies, "Kaplan provides *no meaningful information* to a person skilled in the

IPR2013-00041
Patent No. 5,746,775

art concerning whether ethanol or any other alcohol would be effective as an anticalcification agent." PO Response 31 (emphasis added).[9]

St. Jude opposes Michigan's arguments on several grounds, including a defense of the dog model and testing period used by Kaplan. Pet. Reply 4-10. According to St. Jude, Kaplan is a peer-reviewed article authored by a research group at the well-known Hope Heart Institute. *Id*. at 4. St. Jude proffers the testimony of Dr. Butcher to support its arguments. Ex. 1016. Dr. Butcher states that the level of information provided in Kaplan is appropriate to both the time and its purpose. *Id*. at 5. Dr. Butcher also notes that a person of ordinary skill in the art would not have concluded that storage in GA increases calcification, because the tissues of Kaplan were saturated fully with GA during pretreatment and could not have absorbed more GA during storage. *Id*.

Michigan's criticisms of the Kaplan article are not wholly without merit. Whatever the faults of the Kaplan experiment, however, we do not find that they rise to such a level that a person of ordinary skill would have disregarded completely the teachings of Kaplan. Kaplan's disclosure that calcification was not seen in vessels stored in 50% ethyl alcohol would have, at minimum, given the person of ordinary skill in the art a reason to investigate further the potential

---

[9] Michigan also contends that Dr. Kaplan is not a person of ordinary skill in the art, because she admitted under cross-examination that she was unfamiliar with many aspects of calcification, including methods of quantitatively measuring calcification and performing a histological evaluation of tissue. PO Resp. 33. During cross-examination, Dr. Kaplan appears to have been unable to describe what is meant by calcification of tissue. *Id*. (citing Ex. 2013, 21:13-32:12). Dr. Kaplan's level of skill, however, is irrelevant to what the hypothetical person of ordinary skill would have understood the teachings of the Kaplan article to be. Furthermore, this final written Decision does not rely on the testimony of Dr. Kaplan for what one of ordinary skill in anticalcification would have understood regarding the Kaplan article.

14

anticalcification effects of ethanol, and substitute the 50% ethanol into the method of Levy.

### Other Reasons to Combine

We also find that other reasons to combine Levy, Kaplan, and Holman existed at the time of the invention. All three references teach subjecting GA-treated bioprosthetic tissue to treatment with a C1-C3 aliphatic alcohol. Ex. 1002, 4:6-21; Ex. 1009, p. 28; Ex. 1011, 2:46-49. The close structural and functional similarity of the isopropanol of Levy ($C_3H_7OH$) to the ethanol of Kaplan and Holman ($C_2H_5OH$) suggests, at minimum, that the two alcohols could be used interchangeably. *See In re Payne*, 606 F.2d 303, 313 (CCPA 1979) ("expectation that compounds similar in structure will have similar properties" supports obviousness). Michigan's argument that a person of ordinary skill would have considered high concentrations of ethanol to be toxic is contradicted by Kaplan and Holman, which use 50% and 70% ethanol without noting any toxic effects. Ex. 1009, p. 48; Ex. 1011, 2:46-49.

Michigan's argument that recognition of the anticalcification effects of ethanol is necessary for a finding of a reason to combine is not persuasive. "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007). As noted above, we do not interpret the objective reach of the claim, construed under the broadest reasonable interpretation standard, to be limited to the anticalcification effects of ethanol; therefore, it is not dispositive that Levy and Holman use C1-C3 aliphatic alcohol as a solvent or sterilant. Rather, we find that a person of ordinary skill in the art would have had reason to use the 50% ethanol of Kaplan as a storage medium, or the 70% ethanol of Holman as a

steralant, in place of the isopropanol of Levy, which also acts as a storage medium or sterilant.  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *KSR*, 550 U.S. at 416.  This modification would have resulted in the claimed invention.

### 2.  Expectation of Success

Michigan argues that there would have been no reasonable expectation of success in combining Levy, Kaplan, and Holman, "because . . . none of the references teach[es] to one skilled in the art the use of ethanol or any alcohol *for anticalcification purposes*."  PO Resp. 44 (emphasis added).  We do not consider this argument persuasive, as calcification resistance is not an element of the claims.  *See KSR*, 550 U.S. at 419 (in an obviousness analysis, "neither the particular motivation nor the avowed purpose of the patentee controls").  Michigan does not argue that a person of ordinary skill in the art would have been unable to incorporate the ethanol of Kaplan or Holman in Levy, nor is there any evidence that the artisan would have expected such an incorporation to be unsuccessful.  "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *Id.* at 421.

### 3.  Teaching Away

Finally, Michigan argues that "one skilled in the art would be discouraged from making the asserted combination, as Carpentier and Gong both teach away from using a C1-C3 aliphatic alcohol for anticalcification treatment of a GA-pretreated bioprosthetic tissue."  PO Resp. 44.  "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 51-52 (1966)).  A reference teaches away

16

**A16**

IPR2013-00041
Patent No. 5,746,775

from a combination when, for example, a person of ordinary skill in the art would be discouraged from following the path set out in the reference, or would be led in a direction divergent from that chosen by the inventor. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "In general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Id*.

We address the two references raised by Michigan below.

*Carpentier*

Michigan contends that Carpentier teaches away from the combination because it discloses that stannic and ferric ions, not the glycerol/ethanol solution in which the ions were dissolved, were responsible for the anticalcification effect observed in Carpentier. *Id*. at 19-21 (citing Ex. 1004, 5:62-6:12). Specifically, Michigan focuses on Carpentier's Example 3, which compares the anticalcification effect of "aged glycerol," which contained ions, to "commercial glycerol," which did not. Ex. 1004, 6:2-12, 6:39-46, 8:1-20. Michigan notes that Carpentier found that commercial glycerol did not have the same anticalcification effect as aged glycerol, but rather "teaches the direct opposite, that uncontaminated glycerol 'does not provide the calcification mitigation' that results when using glycerol that had been contaminated with ferric or stannic ions." PO Resp. 21 (quoting Ex. 1004, 8:3-5).

St. Jude argues that Carpentier's disclosure that the metal ions of an aged glycerol provide the observed anticalcification effect is not a teaching away, as the challenged claims do not exclude metal ions from their scope. Pet. Reply 10.

We do not find that Carpentier teaches away from the invention, for several reasons. First, Michigan narrowly focuses its argument on the anticalcification effects observed by Carpentier; however, as noted above, the reason to combine

17

**A17**

Levy, Kaplan, and Holman is broader than calcification resistance. If a person of ordinary skill in the art would have combined the references for a reason other than anticalcification, whether Carpentier teaches away from using alcohol for anticalcification is irrelevant.

Second, we do not consider Carpentier to teach that alcohol *cannot* provide anticalcification effects, but merely that the anticalcification effect of an alcohol containing stannic and ferric ions provides a *greater* anticalcification effect than the alcohol alone. Indeed, Example 3 shows that 4 samples treated with "commercial glycerol" showed no observable calcification. Ex. 1004, 8:12. We understand Carpentier's statement that "commercial glycerol [] does not provide the calcification mitigation as does [aged glycerol]" (*id*. at 8:3-5) to mean that commercial glycerol does not provide *as much* calcification mitigation as aged glycerol, not that commercial glycerol provides *no* calcification mitigation. This falls short of the type of disclosure necessary for a teaching away. *See In re Gurley,* 27 F.3d at 554 ("[a] known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use").

Finally, we note that Michigan's reliance on Example 3 as a teaching away is misplaced, as the Example compares two methods, neither of which is within the scope of the claims. Treatment 1 of Example 3 is "aaa$_B$/Glut Mg," which we understand to denote treatment with aged glycerol (aaa$_B$) followed by tanning with glutaraldehyde. Treatment 2 is, similarly, "aaa$_C$/Glut Mg," denoting treatment with commercial glycerol (aaa$_C$) followed by tanning with glutaraldehyde. Michigan agreed with this interpretation of Example 3. Tr. 27 ("That's true, for most examples, Carpentier teaches glycerol first and then GA second.").

18

**A18**

IPR2013-00041
Patent No. 5,746,775

By contrast, the claims of the present invention—and the methods of Levy, Kaplan, and Holman—each teach fixing tissues with GA first, and then treatment or storage in alcohol.  Therefore, even if we were to accept Michigan's characterization of the disclosure of Carpentier and conclude that the reference discourages treatment of tissue with commercial glycerol followed by GA, it does not follow that the reference also discourages treatment of tissue with GA followed by commercial glycerol.  For all the foregoing reasons, we do not conclude that Carpentier teaches away from the claimed invention.

*Gong*

Michigan makes many of the same teaching away arguments with respect to Gong.  Table 1 of Gong discloses several experimental groups, of which Group A was treated with only glycerol, whereas Groups B-D were treated with glycerol and then GA or formaldehyde, and Group E was treated with GA and formaldehyde but not glycerol.  Ex. 1015, p. 289.  Michigan directs our attention to Figure 2 of Gong, which compares calcification of samples in Groups A, D, and E, and states that "[v]alves treated with glycerol had a lower incidence of calcification than those treated with glutaraldehyde."  *Id.* at 290.   In Michigan's view, the two largest bars of Figure 2 provide a teaching away, because they show that samples treated with glycerol and then GA show increased calcification over samples treated with GA and formaldehyde, but not glycerol.  PO Resp. 23; Tr. 31-32 ("Gong teaches the glycerol actually makes calcification worse when used in combination of a GA.").

We find the evidence of a teaching away in Gong lacking for many of the same reasons set forth above with respect to Carpentier.  Most significantly, we question the applicability of the examples cited by Michigan to the claims at issue in this trial, as they do not disclose methods within the scope of the claims, or even

19

**A19**

similar to the claimed methods.  As Michigan acknowledged at oral hearing, the protocol for Group B was to treat with glycerol first, then treat with GA, which is the reverse of that required by the challenged claims.  Tr. 32.  Even if Figure 2 of Gong teaches that treatment with glycerol then GA is inferior to treating with GA and formaldehyde, it does not follow that the claimed treatment with GA then glycerol is similarly inferior.  The evidence does not rise to that required for a teaching away.

Furthermore, we disagree with Michigan's summarization of Gong as teaching that "glycerol actually makes calcification worse."  It is impossible to tell from Figure 2, or the other data provided in Gong, whether the difference in calcification between groups D and E exists because glycerol increases calcification, or because formaldehyde decreases it.  Gong certainly does not conclude that glycerol makes calcification worse, but rather concludes that glycerol treatment—albeit, in the absence of GA—leads to less calcification than GA treatment.  Ex. 1015, p. 291.

### D. Combination of Carpentier, Kaplan, and Gong

Again, we do not discern any significant dispute between the parties that all elements of claims 23, 25, 26, 28, and 29 are taught by one or more of Carpentier, Kaplan, and Gong.  In our Decision to Institute, we found that Carpentier teaches methods for treating GA-pretreated bioprosthetic materials, including the claimed porcine heart valves, bovine pericardium, human dura matter and the like.  Ex. 1004, Abstract, 2:54-56, 2:64-3:3, 2:59-63.  Carpentier treats the tissue for a period of time ranging from 24 hours to 200 hours in an aqueous solution comprising ferric ions, 1/3 glycerol, and 1/3 ethanol.  *Id*. at 4:67-5:5, 6:38-46.  Kaplan teaches rinsing the bioprosthetic tissue prior to implantation.  Ex. 1009, pp. 48-49.

IPR2013-00041
Patent No. 5,746,775

Michigan does not challenge any of the foregoing findings from our Decision to Institute, or argue separately any of the limitations present in the dependent claims. In view of our construction of *at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol* above, however, we revisit our prior determination that an additional element of dependent claim 25 is taught by Carpentier.

Claims 23, 26, 28, and 29 each require at least about 50% by volume of a water-soluble C1-C3 aliphatic alcohol, which we determined above could be met by a combination of alcohols. Carpentier teaches a solution containing 1/3 glycerol and 1/3 ethanol—or 67% alcohol—thereby meeting the 50% requirement of the claims. In our Decision to Institute, we relied on Carpentier as teaching or suggesting all elements of claims 23, 26, 28, and 29, save the rinsing step, which was taught by Kaplan. Dec. 13. We reaffirm that finding today.

Claim 25, however, states that "the alcohol is ethanol." By specifying a single alcohol, claim 25 requires that 50% by volume of the solution is that alcohol, namely ethanol. Carpentier's disclosure of 33% ethanol and 33% glycerol does not meet the additional limitation of claim 25. Instead, we rely on the teaching in Kaplan of treatment with a 50% ethanol solution as meeting this limitation. Ex. 1009, p. 52.

Again, the primary dispute between the parties on this ground of unpatentability is whether a person of ordinary skill in the art would have had reason to combine the references, and would have had a reasonable expectation of success in doing so. We address these issues below.

1. Reason to Combine

Michigan argues that St. Jude has failed to establish that a person skilled in the art would have had reason to combine Carpentier, Kaplan, and Gong.

21

**A21**

IPR2013-00041
Patent No. 5,746,775

According to Michigan, Carpentier is directed to methods of using ferric or stannic ions to make tissue calcification-resistant, Gong is concerned with evaluating the effect of aldehydes such as GA on tissue calcification, and Kaplan "mentions calcification in the context of GA storage, but does not provide any meaningful information or reliable data concerning anticalcification treatment of tissues." PO Resp. 46. Given these different purposes, Michigan concludes that a person of ordinary skill in the art would have had no motivation to modify the ion-treatment process of Carpentier with Kaplan or Gong, to result in a different treatment process that uses alcohol for anticalcification. *Id.*

This argument suffers from many of the same faults discussed above in the prior ground of unpatentability. First, we find that Kaplan, at the very least, provides a sufficient suggestion that ethanol has anticalcification properties such that a person of ordinary skill in the art would have reason to investigate using ethanol in the treatment method of Carpentier.

Second, Michigan's argument, to the extent it focuses on the motivation to modify the treatment process of Carpentier that includes ferric and stannic ions, is beside the point. The claims of the '775 patent do not exclude ions; in fact, claim 26 expressly requires the presence of a multivalent metallic cation. There is no reason to modify Carpentier to remove the ion treatment in order to arrive at the claims; the only modification that is required is the inclusion of the rinsing step of Kaplan. Whether there was any recognition of the anticalcification properties of ethanol is not relevant to the question of whether a person of ordinary skill would have added a rinsing step to the method of Carpentier, especially when there is unchallenged testimony in the record that such a step was conventional. Ex. 1010 ¶ 19.

We conclude that St. Jude has established that a person of ordinary skill in the art would have had reason to combine Carpentier, Kaplan, and Gong in the manner set forth above.

### 2. Expectation of Success

With respect to the combination of Carpentier, Kaplan, and Gong, Michigan again focuses too narrowly on the expectation of success, arguing that "[t]here would [] be no reasonable expectation of success in combining these references, because, . . . none of the references teach[es] the use of ethanol or any alcohol *for anticalcification purposes.*" PO Resp. 46 (emphasis added). This argument conflates the reason for the current invention with the expectation a person of ordinary skill would have in successfully making the combination of the teachings of the references. As we stated above, neither the patentee's particular motivation nor its avowed purpose controls the obviousness inquiry. *KSR*, 550 U.S. at 419. We are not persuaded that, even if the prior art lacked recognition of ethanol's anticalcification effects, a person of ordinary skill in the art would have not expected success in combining the treatment process of Carpentier with the rinsing step of Kaplan.

### 3. Teaching Away

For the same reasons discussed above, we are not persuaded that Carpentier or Gong teaches away from the combination of Carpentier, Kaplan, and Gong.

### E. *Objective Indicia of Nonobviousness*

Michigan contends that objective indicia demonstrate nonobviousness of the challenged claims. PO Resp. 44-45, 47. In particular, Michigan presents evidence of the commercial success of St. Jude's products that are manufactured allegedly

using the patented process, and long-felt need for effective anticalcification treatments. *Id*. at 35-42.

Objective indicia, also called secondary considerations, may provide independent evidence of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."). Consideration of objective indicia, if presented by a patent owner, is part of the obviousness analysis, not "just an afterthought." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013).

### 1.   Commercial Success

To demonstrate nonobviousness based on commercial success, a patent owner must provide evidence of commercial success, as well as evidence that there is a nexus between that success and the merits of the claimed invention. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed.Cir.2004). Evidence of nexus requires "proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

Michigan argues that St. Jude's products, specifically the Epic and Trifecta treated valves, have enjoyed commercial success that is due to the use of the invention of the '755 patent. PO Resp. 35-36. Both products use "LinxAC Technology," identified as an anticalcification process developed and patented by Robert Levy, the inventor of the '775 patent. *Id.* at 36 (citing Ex. 2014). Sales of the Epic and Trifecta products have been in excess of $300 million. *Id.* at 39

(citing Ex. 2017). Michigan contends that a nexus exists between these sales and the '775 patent, demonstrated by St. Jude's marketing of the Epic and Trifecta valves, which emphasizes their anticalcification properties. *Id.* Michigan also asserts that during cross-examination, Scott Lien testified that sales of Biocor (an untreated valve) "have been trending down each year since Epic was introduced in 2008, and that sales of Epic have exceeded sales of Biocor in 2009, 2010, 2011, 2012, and the first half of 2013." Paper 66, Redacted Observations on Cross-Examination of Scott R. Lien, 5 (citing Ex. 2033, 71:3-74:24).

St. Jude counters by arguing that Michigan's evidence of sales is insufficient to show commercial success, as the sales are presented in terms of absolute dollar values instead of market share. Pet. Reply 11-12. St. Jude also contends that Michigan has failed to prove a nexus between the sales and the invention of the '775 patent. According to St. Jude, the Epic and Trifecta products are "medical device[s] filled with important technology and features all unrelated to the claimed process." *Id.* at 12 (citing Ex. 1041 ¶¶ 11-15, 18, 19). St. Jude cites the declaration of Dr. Bruce Lytle, who testifies that surgeons purchase heart valves for features other than anticalcification treatments. *Id.* at 13 (citing Ex. 1065 ¶ 22). In addition, St. Jude notes Scott Lien's testimony that his marketing efforts have focused recently on Trifecta valves, which St. Jude argues shows that any downtrend in sales of Biocor is due to factors other than the Linx AC treatment. Paper 50, Response to Observations on Cross-Examination of Scott R. Lien, 5-6.

Upon our review of the record, we are not persuaded that Michigan has established sufficiently that the St. Jude products enjoyed commercial success, or a nexus between any success and the invention claimed in the '755 patent. With respect to commercial success, we note that Michigan's reliance on the total sales figures of the Epic and Trifecta products (PO Resp. 39) are not meaningful in the

absence of comparative data, such as market share information.  *See Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984); *see also In re Huang*, 100 F.3d at 140 ("[E]vidence related solely to the number of units sold provides a very weak showing of commercial success.").  At oral hearing, Michigan conceded that the sales numbers in a vacuum do not tell the Board anything regarding commercial success.  Tr. 40-41 ("You're right, dollar figures in a vacuum don't tell it.").

The only comparative data cited by Michigan compares the pricing and sales of St. Jude's Epic (treated) product to the pricing and sales of St. Jude's Biocor (untreated) product.  Tr. 43.  Comparative product sales within a company, however, cannot provide the evidence of commercial success that could be obtained by comparing competing products marketed by different companies.  The relative pricing and sales of St. Jude's Epic and Biocor products may be due to marketing choices by St. Jude, as opposed to any commercial success of the products themselves.  Thus, we cannot conclude on this record that the St. Jude products have enjoyed commercial success.

Nor has Michigan presented persuasive evidence of a nexus between any commercial success and the invention claimed in the '775 patent.  While we may infer a nexus when "the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent," that is not the case here.  *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.1988).  The invention disclosed in the '775 patent is a method, which is used during the manufacture of St. Jude's Epic and Trifecta valves[10] to impart a

---

[10] A determination that the Epic product is manufactured using the claimed process is outside our purview, and is the subject of an ongoing litigation between the parties.  For the purposes of this Decision, we will assume—without deciding—

certain property: calcification resistance.  The commercially successful "thing," which Michigan asserts is the Epic and Trifecta, is *not* the invention claimed in the patent.  In such a situation:

> When the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process— the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.

*Id*.

Michigan relies heavily on St. Jude's marketing materials to establish a nexus.  PO Resp. 39-40.  Specifically, Michigan notes that St. Jude markets the Epic valve as identical to the Biocor valve, but incorporating "patented anticalcification technology."  *Id*. (citing Ex. 2018).  While we recognize that prominence of the patented technology in St. Jude's advertising may create an inference of a nexus (*see Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997)), the totality of the record before us does not establish such a nexus.  Any inference of a link between sales of the Epic and Trifecta valves and the '775 patent's anticalcification treatment must be weighed against the testimony of St. Jude's witnesses.  According to Scott Lien, St. Jude's witness, several features such as durability, hemodynamics, and mechanical improvements are incorporated into the Epic and Trifecta valves.  Ex. 1041 ¶¶ 11-15, 18, 19.  In addition, Dr. Bruce Lytle, another St. Jude witness, testified that these features factor into doctors' purchasing decisions more heavily than the particular anticalcification treatment used on the valves.  Ex. 1065 ¶ 22 ("the available

---

that the Epic valve is made using the claimed process.  At oral argument, St. Jude agreed to such an assumption for the purposes of this proceeding.  Tr. 80.

human data do not support selecting any particular [valve] based upon the specific type of antimineralization treatment").

Based on the foregoing, we are unpersuaded that the record establishes a "legally sufficient relationship" between the patented method and the products which are sold. Michigan, therefore, has failed to present evidence sufficient to establish that St. Jude's products enjoy commercial success, or that any nexus exists between such success and the '775 patent.

### 2. Long-Felt Need

Nor do we find persuasive Michigan's contention that the '775 patent addressed a long-felt, but unsolved, need. To establish such a need, a patent owner must show that there was a persistent problem that was recognized by those of ordinary skill in the art. *See In re Gershon,* 372 F.2d 535, 539 (CCPA 1967). The problem must not have been solved previously by another, and the claimed invention must, in fact, satisfy the long-felt need. *See Newell Companies v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988); *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971).

Michigan contends that "[s]ince at least 1980, there has been a recognized need in the art for an effective anticalcification method to address the problem of calcification of GA pre-treated bioprosthetic devices." PO Resp. 41 (citing Ex. 2000 ¶ 17). Even if such a need existed at one time, however, the record clearly shows that it was solved prior to the '775 patent. Both Levy and Carpentier disclose effective anticalcification methods for GA pre-treated bioprosthetic devices, which use metal ions. At oral argument, Michigan conceded as much:

JUDGE FITZPATRICK: . . . before the invention, were there methods of making tissue calcification resistant?

IPR2013-00041
Patent No. 5,746,775

>MR. WEINER: There were some methods. Some of them, for
>example, the Levy '661 patent cites a different method for making
>tissue calcification resistant. There were other methods in the art.
>JUDGE FITZPATRICK: Thank you.
>MR. WEINER: *It would not be correct to say that the '775 patent was
>the first patent to provide a method for preventing calcification of GA
>pretreated implanted tissue.*

Tr. 39 (emphasis added).

To distinguish the '775 patent from these prior solutions, Michigan redefines
the long-felt need as "render[ing] the tissue resistant to calcification, while
eliminating the need for use of potentially harmful metal ions." PO Resp. 42.
According to Dr. Frederick Schoen, Michigan's witness, metal ions "can
potentially cause problems such as stiffening of the heart valve matrix and metal
accumulation-related toxicity problems."  Ex. 2000 ¶ 17.  There is no evidence in
the record, however, that treating GA-pretreated tissue with an alcohol, as required
by the challenged claims, solved these problems of stiffening and toxicity.[11]  The
specification of the '775 patent is silent as to the alleged problems posed by metal
ions; indeed, the claimed invention encompasses the use of such ions.  Ex. 1001,
5:59-6:10.

Nor do we find it determinative that witnesses such as Dr. Schoen and Dr.
Butcher, or references such as Gong, expressed a need in October 1993 for
improved anticalcification treatments.  Ex. 2000 ¶ 17; Ex. 2031, 32:7-10; Ex. 1015,
p. 290.  The mere fact that existing products could be improved is not proof of a
long-felt, but unmet, need.  To the contrary, Michigan conceded that even in the

---

[11] At oral hearing, Michigan contended that Dr. Schoen offered an opinion that
toxicity is not an issue with ethanol treatment.  Tr. 38.  We are unable to discern
any statement by Dr. Schoen in his testimony to that effect.

29

**A29**

current state of the art, there potentially could be anticalcification treatments developed that improve beyond the '775 patent. Tr. 38-39.

For these reasons, we find that Michigan has failed to provide sufficient evidence of long-felt, but unmet, need.

### F.  Conclusion of Obviousness

We have considered the scope and content of the prior art; the differences between the prior art and the challenged claims; the level of ordinary skill in the art; and the objective indicia of nonobviousness. *See Graham*, 383 U.S. at 18-19. Based on our review of the record and the preponderance of the evidence, we conclude that claims 23 and 25-29 would have been obvious over the combined teachings of Levy, Kaplan, and Holman, and that claims 23, 25, 26, 28, and 29 would have been obvious over the combined teachings of Carpentier, Kaplan, and Gong.

### G. Motions to Exclude

A motion to exclude is required to preserve an objection to the admissibility of evidence.  37 C.F.R. § 42.64(c).  A motion to exclude must identify the objections in the record in order, and must explain why the objected-to evidence is not admissible.  *Id.*  A motion to exclude, however, may not be used to challenge the sufficiency of the evidence to prove a particular fact.  Office Patent Trial Practice Guide, 77 Fed. Reg. 48,765, 48,767 (Aug. 14, 2012).  Both parties timely filed motions to exclude in this proceeding; we discuss them, in turn, below.

#### 1.    Petitioner's Motion to Exclude

St. Jude seeks to exclude the following evidence:  1) Exhibits 2026-2030, offered during the deposition of Scott Lien, and testimony of Mr. Lien directed to these exhibits; 2) Mr. Lien's cross-examination testimony as to the relative pricing

of Biocor and Epic valves; 3) Mr. Lien's cross-examination testimony as to market share; 4) portions of Dr. Bruce Lytle's cross-examination testimony; and 5) portions of Dr. Jonathan Butcher's cross examination testimony.  Pet. Mot. 5-14.  The primary basis for each of these objections is that Michigan's cross-examination of the witnesses went beyond the scope of their direct testimony, in violation of 37 C.F.R. § 42.53(d)(5)(ii).  Pet. Mot. 5.  Additionally, St. Jude objects to Exhibits 2027-2030 for lack of foundation, lack of authentication, and hearsay.  *Id.* at 7.

Resolution of St. Jude's motion is unnecessary, as this final written Decision does not rely on Exhibits 2026-2030, or any of the portions of the cross-examination testimony to which St. Jude objected, let alone in a manner adverse to St. Jude.  Accordingly, we *dismiss* St. Jude's motion to exclude as moot.

### 2.   Patent Owner's Motion to Exclude

Michigan seeks to exclude Exhibit 1016, the declaration of Dr. Jonathan Butcher, and Exhibits 1017, 1019-1021, and 1023-1040, which were offered in support of Dr. Butcher's testimony.  PO Mot. 1.  All of the evidence to which Michigan objects was submitted in support of St. Jude's Reply.  According to Michigan, the declaration and supporting exhibits were untimely, as they were served in violation of 37 C.F.R. § 42.23(b) ("[a] reply may only respond to arguments raised in the corresponding opposition or patent owner response"); *see also* Office Patent Trial Practice Guide; 74 Fed. Reg. at 48,767 ("a reply that raises a new issue or belatedly presents evidence will not be considered").  Michigan contends that Dr. Butcher's declaration is "new evidence that could have been presented with St. Jude's petition," proffered to cure various alleged deficiencies in the testimony of Dr. Kaplan.  PO Mot. 9.  Permitting St. Jude to offer Dr. Butcher's declaration and supporting exhibits in reply would, according to

31

IPR2013-00041
Patent No. 5,746,775

Michigan, "allow[] substitution of a new witness for one that has been discredited." *Id.* at 10.

St. Jude maintains that Dr. Butcher's testimony is proper reply evidence, presented to respond to arguments made in Michigan's patent owner response. Paper 53, Petitioner's Opposition to PO Mot., 2. Specifically, St. Jude points out that Dr. Butcher's testimony responds to Michigan's arguments that a person of ordinary skill would not have found the Kaplan article to be credible. *Id.* at 4. St. Jude also argues that Michigan's objections were not preserved for the motion to exclude, as the objections, as served, failed to identify the grounds for objection with sufficient particularity, as required by 37 C.F.R. § 42.64(b)(1).

At the outset, we disagree that Michigan's objections were not preserved properly. Within five days of service of the Butcher declaration and supporting exhibits, Michigan served objections, objecting to the admissibility of Exhibits 1016-1069 as "untimely." Ex. 2034 (citing 37 CFR 42.23(b); Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,767 (Section II(I)). While the objections served by Michigan were not overly explanatory, our rules only require objections to identify their grounds "with sufficient particularity to allow correction in the form of supplemental evidence." 37 C.F.R. § 42.64(b)(1). The basis of Michigan's objections was that the evidence was untimely, a fault that cannot be corrected through the service of supplemental evidence. For this reason, St. Jude suffered no prejudice from the alleged lack of sufficient particularity in Michigan's objections. Michigan's motion to exclude is procedurally proper.

Nevertheless, we deny Michigan's motion to exclude. To the extent Dr. Butcher's testimony and supporting exhibits address the alleged deficiencies in the experimental protocol of the Kaplan article, these are issues that were raised for the first time by Michigan in its patent owner response. A petitioner is not expected to

anticipate, in its petition, every counterargument a patent owner might make in response. We find Michigan's arguments that St. Jude submitted the testimony of Dr. Kaplan with its petition because it anticipated the deficiencies in the Kaplan article's dog model to be without merit.

To the extent that Dr. Butcher's testimony can be construed as an attempt to "substitute" his testimony as a person of ordinary skill in the art for Dr. Kaplan's testimony, we consider this issue to be moot. Our decision does not rely on Dr. Butcher to establish the level of ordinary skill or inform how a person of ordinary skill would understand the prior art references.

For the foregoing reasons, Michigan's motion to exclude is *denied.*

## III. CONCLUSION

We conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 25-29 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined teachings of Levy, Kaplan, and Holman, and that claims 23, 25, 26, 28, and 29 are unpatentable under 35 U.S.C. § 103 as having been obvious over the combined teachings of Carpentier, Kaplan, and Gong. St. Jude's motion to exclude is dismissed; Michigan's motion to exclude is denied.

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 23 and 25-29 of U.S. Patent No. 5,746,775 are *unpatentable*;

FURTHER ORDERED that Petitioner's motion to exclude is *dismissed*;

FURTHER ORDERED that Patent Owner's motion to exclude is *denied*; and

IPR2013-00041
Patent No. 5,746,775

FURTHER ORDERED that, because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

**A34**

IPR2013-00041
Patent No. 5,746,775


For Petitioner:

William Mentlik
Arnold H. Krumholz
Michael H. Teschner
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
wmentlik.ipr@ldlkm.com
akrumholz.ipr@ldlkm.com
mteschner.ipr@ldlkm.com

For Patent Owner:

David A. Casimir
John M. Jones
CASIMIR JONES S.C.
dacasimir@casimirjones.com
jmjones@casimirjones.com

# TAB 2

Patent No. 5,746,775
Petition for *Inter Partes* Review
Attorney Docket No. STJUDE 7.1R-001


## UNITED STATES PATENT AND TRADEMARK OFFICE

───────────────────────────

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

───────────────────────────


## ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.
Petitioner

v.

## THE BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN
Patent Owner


Patent No. 5,746,775
Issue Date:  May 5, 1998
Title:  METHOD OF MAKING CALCIFICATION-RESISTANT
BIOPROSTHETIC TISSUE

───────────────────────────

*Inter Partes* Review No. <u>Unassigned</u>

───────────────────────────────────────────────


## PETITION FOR *INTER PARTES* REVIEW
## UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.100 *ET SEQ.*


Exhibit 1001 - Levy US 5,746,775


## A39



US005746775A

# United States Patent [19]

## Levy et al.

[11] Patent Number: 5,746,775

[45] Date of Patent: May 5, 1998

[54] **METHOD OF MAKING CALCIFICATION-RESISTANT BIOPROSTHETIC TISSUE**

[75] Inventors: **Robert J. Levy**, Ann Arbor, Mich.; **Danielle Hirsch**, Jerusalem, Israel

[73] Assignee: **The Board of Regent6s of the University of Michigan**, Ann Arbor, Mich.

[21] Appl. No.: **140,722**

[22] Filed: **Oct. 21, 1993**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 689,652, Apr. 23, 1991, Pat. No. 5,368,608, which is a continuation-in-part of Ser. No. 515,484, Apr. 30, 1990, abandoned, which is a continuation-in-part of Ser. No. 176,789, Apr. 1, 1988, Pat. No. 5,094,661.

[51] Int. Cl.$^6$ ............................... A61F 2/02; A61F 2/24; D01C 3/00

[52] U.S. Cl. .......................... 8/94.11; 8/94.28; 8/94.29; 623/1; 623/2; 623/3; 623/12; 623/66

[58] Field of Search ...................... 8/94.11, 94.19, 8/94.28, 94.29; 623/1–3, 11, 12, 66

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 713,046 | 11/1902 | Amend | 8/94.29 |
| 725,648 | 4/1903 | Amend | 8/94.29 |
| 2,750,251 | 6/1956 | Bloch et al. | 8/94.11 |
| 2,970,031 | 1/1961 | Nagy | 8/94.29 |
| 3,560,141 | 2/1971 | Kurilla et al. | 8/94.11 |
| 3,922,356 | 11/1975 | Cohly | 8/94.11 |
| 3,974,526 | 8/1976 | Dardik et al. | 3/1.4 |
| 4,097,234 | 6/1978 | Sohde et al. | 8/94.19 |
| 4,323,358 | 4/1982 | Lentz et al. | 8/94.11 |
| 4,378,224 | 3/1983 | Nimni et al. | 8/94.11 |
| 4,402,697 | 9/1983 | Pollack et al. | 8/94.11 |
| 4,405,327 | 9/1983 | Pollock | 8/94.11 |
| 4,481,009 | 11/1984 | Nashef | 8/94.11 |
| 4,553,974 | 11/1985 | Dewanjee | 8/94.11 |
| 4,597,960 | 7/1986 | Cohen | 424/435 |
| 4,647,283 | 3/1987 | Carpentier et al. | 623/11 |
| 4,648,881 | 3/1987 | Carpentier et al. | 623/11 |
| 4,729,139 | 3/1988 | Nashef | 8/94.11 |
| 4,753,652 | 6/1988 | Langer et al. | 8/94.11 |
| 4,770,665 | 9/1988 | Nashef | 8/94.11 |
| 4,786,287 | 11/1988 | Nashef et al. | 8/94.21 |
| 4,798,611 | 1/1989 | Freeman, Jr. | 8/94.11 |
| 4,838,888 | 6/1989 | Nashef | 623/2 |
| 4,885,005 | 12/1989 | Nashef et al. | 8/94.11 |
| 4,976,733 | 12/1990 | Girardot | 8/94.11 |
| 5,002,566 | 3/1991 | Carpentier et al. | 623/2 |
| 5,080,670 | 1/1992 | Imamura et al. | 623/2 |
| 5,215,541 | 6/1993 | Nashef et al. | 8/94.11 |
| 5,447,536 | 9/1995 | Girardot et al. | 8/94.11 |
| 5,476,516 | 12/1995 | Seifter et al. | 8/94.11 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| A2-267434 | 5/1988 | European Pat. Off. . |
| WO 83/03335 | 10/1983 | WIPO . |
| WO 84/01879 | 5/1984 | WIPO . |
| WO 84/01894 | 5/1984 | WIPO . |

#### OTHER PUBLICATIONS

Okoshi, et al., A New Bioprosthetic Cardiac Valve With Reduced Calcification, *ASAIO Trans.* 1990. 36:M411–M414 (no month).

Tomizawa, et al., Development of a Polyepoxy Compound Cross–linked Heterologous Connective Tissue Tube, *ASAIO Journal* 1992, 38: M357–M361.

*Primary Examiner*—Walter D. Griffin
*Attorney, Agent, or Firm*—Rohm & Monsanto

[57] **ABSTRACT**

A method of treating a collagenous biomaterial, such as porcine aortic valve leaflets or bovine pericardium, by exposing the biomaterial to an alcohol to inhibit in vivo calcification. The biomaterial, preferably glutaraldehyde-pretreated, is subjected to an aqueous solution of 60% to 80% lower aliphatic alcohol, such as ethanol for a period of at least 20 minutes, and preferably, 24 to 72 hours. The biomaterial is rinsed, and then stored in either a glutaraldehyde-free environment or an ethanolic solution of glutaraldehyde. In some embodiments, the treatment solutions include an additional anticalcification agent which may be a soluble salt of a metallic cation, such as $Al^{+3}$ or $Fe^{+3}$.

**32 Claims, 6 Drawing Sheets**



FIG. 1



FIG. 2



FIG. 3



FIG. 4

Case: 14-1723    Document: 24    Page: 122    Filed: 11/12/2014



FIG. 5



*FIG. 6*

5,746,775

1

## METHOD OF MAKING CALCIFICATION-RESISTANT BIOPROSTHETIC TISSUE

### RELATIONSHIP TO OTHER APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 07/689,652, filed on Apr. 23, 1991 now U.S. Pat. No. 5,368,608 issued on Nov. 29, 1994, as a continuation-in-part of Ser. No. 07/515,484 filed on Apr. 30, 1990, now abandoned, which in turn was a continuation-in-part of Ser. No. 07/176,789 filed on Apr. 1, 1988, now U.S. Pat. No. 5,094,661, issued on Mar. 10, 1992, all applications being assigned to the assignee hereof. The disclosure of the foregoing applications are incorporated herein by reference in their entirety.

### GOVERNMENT RIGHTS CLAUSE

This invention was made with government support under Contract HL38118 awarded by the National Institutes of Health. The government has certain rights in the invention.

### BACKGROUND OF THE INVENTION

This invention relates generally to materials which are resistant to in vivo calcification, and more particularly, to a method of preparing calcification-resistant biomaterials, such as bioprosthetic tissue, suitable for implantation in a living being.

More than 100,000 cardiac valve prostheses are placed in patients each year. Frequently, valve replacement surgery is the only means of treating cardiac valve disease. Currently used replacement valves include mechanical valves which may be composed entirely of a synthetic polymeric material such as polyurethane; bioprosthetic valves derived from bovine pericardium or porcine aortic valves; and aortic homografts.

Use of mechanical valves is frequently complicated by thrombosis and tissue overgrowth leading to valvular failure. Bioprosthetic heart valves have improved thrombogenicity and hemodynamic properties as compared to mechanical valve prostheses. However, calcification is the most frequent cause of the clinical failure of bioprosthetic heart valves fabricated from porcine aortic valves or bovine pericardium. Human aortic homograft implants have also been observed to undergo pathologic calcification involving both the valvular tissue as well as the adjacent aortic wall albeit at a slower rate than the bioprosthetic heart valves. Pathologic calcification leading to valvular failure, in such forms as stenosis and/or regurgitation, necessitates re-implantation. Therefore, the use of bioprosthetic heart valves and homografts has been limited because such tissue is subject to calcification. In fact, pediatric patients have been found to have an accelerated rate of calcification so that the use of bioprosthetic heart valves is contraindicated for this group.

Unfortunately, pathologic calcification also further complicates the use of synthetic vascular grafts and other artificial heart devices, such as ventricular assist systems, because it affects the flexibility of the synthetic polymers used to produce the devices.

The mechanism for pathological calcification of cardiovascular tissue is not fully understood. Generally, the term "pathologic calcification" refers to the undesirable deposition of calcium phosphate mineral salts. Calcification may be due to host factors, implant factors, and extraneous factors, such as mechanical stress. There is some evidence to suggest that deposits of calcium are related to devitalized

2

cells, and in particular, cell membranes, where the calcium pump ($Ca^{+2}$—$Mg^{+2}$—ATPase) responsible for maintaining low intracellular calcium levels is no longer functioning or is malfunctioning. Calcification has been observed to begin with an accumulation of calcium and phosphorous, present as hydroxyapatite, which develops into nodules which can eventually lead to valvular failure.

The preparation of bioprosthetic tissue prior to implantation typically includes treatment to stabilize it against subsequent in vivo enzymatic degradation, typically by crosslinking molecules, particularly collagen, on and in the tissue. Various aldehydes have been used for this purpose, including glyoxal, formaldehyde, and glutaraldehyde. Glutaraldehyde, however, is the agent of choice. In addition to fixing the tissue, glutaraldehyde is a good sterilizing agent and it reduces the antigenicity of the tissue. To date, glutaraldehyde is the only effective crosslinking agent for preparing tissues for implantation that can be used at physiologic pH under aqueous conditions. Unfortunately, glutaraldehyde is now known to promote calcification. There is, thus, a need in the art for a means of reversing the calcification-promoting effects of crosslinking agents such as glutaraldehyde. It would be particularly desirable to incorporate anti-calcification agents into existing protocols for preparation of clinical-grade biomaterials.

Non-aldehyde crosslinking agents have been investigated, such as polyepoxides (e.g., polyglycerol polyglycidyl ethers sold under the trademark Denacol by Nagasi Chemicals, Osaka, Japan), but there have been no conclusive studies demonstrating efficacy of polyepoxide cross-linked tissues in vivo.

Research on the inhibition of calcification of bioprosthetic tissue has primarily focussed on tissue pretreatment with either detergents or diphosphonate anticalcification agents. Detergent pretreatment with noncovalently linked detergents, such as sodium dodecyl sulfate (SDS), and a covalently bound detergent, such as amino oleic acid, have been demonstrated to be efficacious to materials exposed in circulating blood. However, both detergents and diphosphonates tend to wash out of the implanted bioprosthetic tissue with time due to blood-material interactions. Thus, these treatments merely delay the onset of the inevitable calcification process. Accordingly, there is also a need for a means of providing long-term calcification resistance for bioprosthetic heart valves and other implantable biomaterials or devices which are subject to in vivo pathologic calcification.

In addition, detergents disadvantageously affect the tissue, resulting in a diminution of the collagen denaturation temperature, or shrink temperature ($T_s$), which is an important measure of material strength, durability, and integrity. In some cases, use of detergents results in local toxicity. There is, thus, a need for an effective method of imparting anti-calcification properties to bioprosthetic tissues which is not accompanied by the deleterious effects of detergents.

Further, all of the foregoing techniques still result in some degree of pathologic calcification in vivo as measured by calcium content of explanted specimens. There is, therefore, a need for a treatment that results in a greater level of calcification inhibition.

The use of alcohols in biomaterial treatment protocols is well-known, but is typically limited to its use as a solvent and/or sterilizing agent. For example, alcohol has been used in sterilizing rinses and for storage solutions. However, there has never been any teaching or suggestion that ethanol has any effect on prevention of pathologic calcification. It would be advantageous to use this well-known compound in existing protocols for rendering bioprosthetic tissue calcification-resistant.

5,746,775

3

It is, therefore, an object of this invention to provide a method of treating biomaterials, particularly glutaraldehyde-pretreated bioprosthetic tissue, to render the biomaterials resistant to in vivo pathologic calcification.

It is another object of this invention to provide a method of treating biomaterials to have a long-term, or prolonged, resistance to in vivo pathologic calcification.

It is also an object of this invention to provide a method of treating biomaterials to render the biomaterials resistant to in vivo pathologic calcification which can be easily incorporated into existing protocols for treatment of such materials, e.g., will permit the continued usage of the crosslinking agent glutaraldehyde.

It is a further object of this invention to provide a method of treating biomaterials to render the biomaterials resistant to in vivo pathologic calcification which has little, if any, deleterious effect on physical or mechanical properties of the tissue, such as shrink temperature ($T_s$).

It is a still further object of this invention to provide biomaterials suitable for implantation in a mammal which have improved resistance to in vivo pathologic calcification.

## SUMMARY OF THE INVENTION

The foregoing and other objects are achieved by this invention which provides a method of treating a biomaterial, preferably glutaraldehyde-pretreated bioprosthetic tissue, such as porcine aortic valve components or bovine pericardium, with an alcohol to render the biomaterial resistant to calcification. The alcohol is preferably a lower aliphatic alcohol (C1 to C3), such as methanol, ethanol, propanol or isopropanol. In a preferred embodiment, the alcohol is ethanol.

The term "biomaterial" as used herein refers to collagenous material which may be derived from different animal, typically mammalian, species. The biomaterial is typically suitable for implantation, such as bioprosthetic tissue or the like, but the invention should not be limited thereby. Specific examples include, but are not limited to, heart valves, particularly porcine heart valves; aortic roots, walls, and/or leaflets; bovine pericardium; connective tissue derived materials such as dura mater; homograft tissues, such as aortic homografts and saphenous bypass grafts; tendons, ligaments, skin patches, arteries, veins; and the like. Of course, any other biologically-derived materials which are known, or become known, as being suitable for in-dwelling uses in the body of a living being are within the contemplation of the invention.

In accordance with a preferred embodiment of the invention, the biomaterial is pretreated with glutaraldehyde. Therefore, the alcohol treatment of the present invention can be incorporated into existing protocols and standard known methodologies for preparing bioprosthetic tissue for implantation. Of course, pretreatment of the biomaterial with other crosslinking agents is within the contemplation of the invention. In those embodiments wherein the biomaterial is crosslinked with glutaraldehyde, any of the variety of techniques for glutaraldehyde pretreatment may be used. In a typical glutaraldehyde pretreatment protocol, the biomaterial is exposed and/or stored in a solution of buffered glutaraldehyde under conditions suitable for crosslinking molecules on and in the biomaterial. For example, the biomaterial may be exposed to glutaraldehyde at appropriate temperatures (from about 4° C. to about 25° C.) and pH (from about 6 to about 8, preferably 7.1 to 7.4). Typical glutaraldehyde concentrations in the pretreatment solution range from about 0.2% to about 0.8% w/v or higher, and preferably 0.6%.

4

In accordance with the method of the invention, the amount of alcohol in the treatment solution is greater than about 50% by volume, and preferably in the range of 60% to 80%. The biomaterial is contacted with, or exposed to, the alcohol for a period of time sufficient to render the bioprosthetic tissue resistant to in vivo pathologic calcification, illustratively, from about 20 minutes (i.e., the period of time required for diffusion of ethanol, for example, into bioprosthetic tissue) to in excess of 96 hours. For some biomaterials, excessive exposure to the alcohol may result in a decrease in the anticalcification effects of the alcohol, or may necessitate rehydration of the tissue.

The length of time allotted for exposure in the embodiments described herein is illustrative and can be varied by those of skill in the art. For embodiments of the invention wherein the biomaterial is immersed, or soaked, in a liquid treatment solution of the alcohol, the exposure time is preferably between about 24 to 96 hours. However, longer exposure is within the contemplation of the invention provided appropriate storage conditions are maintained as will be described below. It should be noted, that no deleterious effects on the bioprosthetic tissue have been observed during the suggested period.

The manner in which the biomaterial is exposed to the alcohol includes, but is not limited to vapor, plasma, liquid, and/or cryogenic application of the alcohol. Irrespective of the method of exposure, the time period should be sufficient to promote alcoholic-collagen interactions which inhibit calcification, but not so long as to cause irreparable dehydration of the tissue by the alcohol.

In accordance with the method of the invention, the alcohol treatment solution is preferably liquid, and is water-based, i.e., is an aqueous solution of greater than about 50% alcohol, and preferably between 60% to 80% alcohol by volume, buffered to a pH between 6.0 and 8.0, and preferably between 7.0 and 7.6, and more preferably 7.4. Alternatively, a mixture of two or more organic solvents may be utilized in the practice of the invention provided that the combined volume of the organic solvents is greater than about 40%, preferably greater than about 50%. For example, a mixture of about 40% ethanol and about 40% acetone has proven effective (see, Example 7).

Suitable buffers for use in the practice of the invention are those buffers which have a buffering capacity sufficient to maintain a physiologically acceptable pH and do not cause any deleterious effects to the biomaterial or interfere with the treatment process. Exemplary buffers include, but are not limited to phosphate-buffered saline (PBS), and organic buffers, such as N-N-2-hydroxyethylpiperzine-N'-2-ethanesulfonic acid (HEPES) or morpholine propanesulphonic acid (MOPS); and buffers which include borate, bicarbonate, carbonate, cacodylate.

In preferred embodiments of the invention, the biomaterial is shaken, or agitated, during exposure to the alcohol treatment solution. Shaking can be accomplished in any manner, such as through use of an orbital shaker, or shaker stand. The alcohol treatment procedure is typically carried out at room temperature (25° C.). However, any temperature which is not deleterious to the tissue, for example 4° C. to about 37° C., is suitable for the practice of the invention.

While the discussion herein is directed to the concentration of alcohol in the treatment solution, e.g., 50% or greater, it is to be understood that alcohols, such as ethanol, diffuse rapidly into tissue so that the concentration of alcohol in solution is approximately the same as the regional concentration of alcohol in the tissue. Therefore, the definition of

**A48**

5,746,775

5

the term "exposure" is to be construed broadly enough to encompass the in situ release of alcohol in implanted tissue, such as that resulting from hydrolysis of tetraethyl esters, for example.

In preferred embodiments of the invention, the biomaterial, treated with alcohol as noted above to reduce calcification, should be rinsed prior to implantation or storage to remove excess alcohol and other deleterious components produced or used in the biomaterial treatment protocol, such as aldehyde fragments from the glutaraldehyde pretreatment. As used herein, the term "rinse" includes subjecting the biomaterial to a rinsing solution, including continuously or by batch processing, wherein the biomaterial is placed in a rinsing solution which may be periodically removed and replaced with fresh solution at predetermined intervals. During rinsing, the tissue is preferably shaken, or intermittently stirred, to ensure even distribution of the rinse solution. Rinsing may be accomplished by subjecting the biomaterial to a rinsing solution, such as fresh HEPES buffer at pH 7.4. Illustratively, a rinse may comprise soaking the biomaterial in fresh rinsing solution which is replaced three times over a period of about 5 to 15 minutes. Alternatively, the rinsing solution may be replaced at intervals of 6 to 8 hours, or less, over a rinse period of 24 hours. In a preferred embodiment, the HEPES buffer is replaced each hour over a rinse period of 24 hours. As used herein, the longer rinse periods are referred to as "washes."

Exemplary rinsing solutions include physiologically suitable solutions, such as water, saline, PBS, HEPES buffered saline, ringers lactate (pH 7.4), sodium bicarbonate (pH 7.4), tris (pH 7.4), and imidazole (pH 7.4).

Subsequent to rinsing, the treated bioprosthetic tissue is ready for implantation or may be sterilized and stored until use. Storage in standard glutaraldehyde solutions of the type typically used for long-term storage of clinical-grade bioprostheses may partially reverse the beneficial effects achieved by the alcohol treatment of the present invention (see, FIG. 2). In accordance with some embodiments of the invention, the treated biomaterial may be stored in an ethanolic-glutaraldehyde solution, preferably in an amount sufficient to maintain calcification inhibition and/or sterility. In a preferred embodiment, the treated biomaterial is stored in a buffered alcohol solution containing glutaraldehyde, typically greater than about 60%, and preferably between about 60% and about 80%, alcohol and less than about 0.5%, preferably between about 0.2% to 0.5%, glutaraldehyde. In a particularly preferred embodiment, the storage solution is 60% ethanol and 0.2% glutaraldehyde (see Table 6 below).

In other embodiments of the invention, biomaterials which have been treated in accordance with the method of the invention are stored in an aldehyde-free environment. In preferred embodiments, treated bioprostheses are placed in sterile bags and subjected to sterilizing radiation, such as gamma-radiation. Of course, the ethanol treatment of the present invention is compatible with many other known sterilizing preservatives and/or techniques which are known, or can be developed, by those of skill in the art.

In accordance with a further method embodiment of the invention, the alcohol treatment solution may also contains one or more additional anticalcification agents, including but not limited to, a soluble salt of a metallic cation, such as Al$^{+3}$ or Fe$^{+3}$, preferably in a concentration range of 0.1M to 0.001M. Water soluble aluminum salts, for example, which are suitable additional anticalcification agents for use in the practice of the present invention, include without limitation, aluminum chlorate, aluminum lactate, aluminum potassium

6

sulfate, aluminum sodium sulfate, aluminum sulfate, aluminum nitrate, and aluminum chloride. In a preferred embodiment, the soluble salt is AlCl$_3$ at 0.1M concentration. Also, water-soluble ferric salts, such as ferric chloride, ferric nitrate, ferric bromide, ferric sodium edentate, ferric sulfate, and ferric formate, are specifically included within the contemplation of the invention. Of course, any salt of aluminum, or iron, which is soluble in the solvent system of the treatment solution, may be used in the practice of the invention.

Other embodiments of the invention include the biomaterials which have been produced by a method according to the invention. In preferred embodiments of the invention, these biomaterials exhibit improved anti-calcification properties, and/or long-term resistance to in vivo pathologic calcification.

BRIEF DESCRIPTION OF THE DRAWINGS

Comprehension of the invention is facilitated by reading the following detailed description, in conjunction with the annexed drawings, in which:

FIG. 1 is a graphical representation of the inhibition of porcine aortic valve calcification in a rat subdermal model for porcine aortic valve specimens (cusps) treated in accordance with a method of the invention;

FIG. 2 is a graphical representation of the calcium content (μg/mg) of porcine aortic valve specimens, treated in accordance with a method of the invention, following 21 day subdermal implantation in rats;

FIG. 3 is a graphical representation of the calcium content (μg/mg) of various porcine aortic valve specimens implanted in sheep for 150 days;

FIG. 4 is a graphical representation of the $^{14}$C cholesterol content, in μg/mg, of glutaraldehyde-pretreated porcine aortic valves as compared to glutaraldehyde-pretreated porcine aortic valves which have been treated with an aqueous solution of ethanol (40% and 80%) in accordance with a method of the invention, or with detergent (1% sodium dodecyl sulfate, SDS);

FIG. 5 is a graphical representation of the calcification content of glutaraldehyde-pretreated porcine aortic valve specimens which have been subjected to a variety of solvents known to remove lipids from tissues; and

FIG. 6 is a graphical representation of T$_s$ in °C. for porcine aortic valve specimens subjected to various ethanol treatment and storage regimens.

DETAILED DESCRIPTION

Given below are several specific illustrative techniques for producing calcification-resistant biomaterials in accordance with the principles of the invention. Although the examples given are primarily directed to the preparation of calcification-resistant heart valves, the techniques described herein are applicable to the creation of any other biomaterials, particularly a prosthesis or a bioprosthetic tissue suitable for implantation.

Further, although the results have been presented in the form of rat subdermal implants and sheep bioprosthetic heart valve replacement studies, it should be noted that these animal model systems result in calcific deposits which closely resemble those seen in clinical-pathologic explant of human tissue. The correspondence of these animal models with human pathology has been documented in both light microscopic and electron microscopic studies.

Glutaraldehyde-pretreated porcine aortic heart valves, both in stent and freestyle (stentless) form, were obtained

5,746,775

| 7 | 8 |

from St. Jude Medical, Inc., St. Paul, Minn. and from Medtronic, Inc., Irvine, Calif. and used in the examples set forth below. Typically, the biomaterials are stabilized and preserved in glutaraldehyde following harvesting, illustratively in a 0.5% solution of glutaraldehyde in a buffer.

## EXPERIMENTAL SECTION

### Example 1

A dose response study was conducted and the results are shown graphically in FIG. 1. Glutaraldehyde-pretreated porcine aortic valve specimens were immersed for 24 hours in aqueous solutions of ethanol ranging in concentration from 0% (control) to 80% ethanol. The ethanol solutions were buffered at pH 7.4 with HEPES (0.05M). The treated porcine aortic valve specimens were implanted in two subcutaneous pouches dissected in the ventral abdominal wall of weanling rats (male, CD, Sprague-Dawley, weighing 50–60 gm). After a period of 21 days, the specimens were removed and examined for calcification by measuring the level of $Ca^{+2}$ ions in the specimen. Concentrations of 50% or greater of ethanol virtually eliminated calcium accumulation in the porcine aortic valve specimens as compared to glutaraldehyde-pretreated controls.

### Example 2

Studies were conducted on porcine aortic valve specimens to determine the length of time of exposure to the alcohol treatment solution which is required for optimal anticalcification effects. FIG. 2 is a graphical representation of the calcium content (μg/mg) of glutaraldehyde-pretreated porcine aortic valve cusp specimens, following 21 day implantation in rat subdermal pouches, which have been exposed to 80% ethanol for periods of 24 hours and 72 hours. Typically, 72 hours of exposure to ethanol results in more calcium accumulation than 24 hours of exposure. However, calcification levels following 72 hours exposure to ethanol were nevertheless consistently below the level of controls (glutaraldehyde-pretreated porcine aortic valve cusps). The calcium content of the control specimens was 178.2±6.166 μg/mg dry tissue whereas the calcium content of the specimens which were subjected to 24 hours exposure to 80% ethanol, followed by a rinse with three 100 ml portions of HEPES buffered saline (pH 7.4) over about a 10 to 15 minute period, was 2.248±0.186 μg/mg. This represents 99% inhibition, i.e., substantial inhibition.

Referring again to FIG. 2, the calcium content of ethanol treated porcine aortic valve specimens, subsequently rinsed or stored in a glutaraldehyde-containing solution, is shown. In one instance ("Glut. Rinse"), the ethanol treated specimens were rinsed in three 100 ml portions of 0.2% glutaraldehyde buffered to a pH of 7.4 (HEPES) over about a 15 minute rinse period. In the second instance ("Glut. Storage"), the ethanol treated specimens were stored in 0.2% glutaraldehyde buffered to a pH of 7.4 (HEPES) for 30 days, and then rinsed with HEPES buffered saline prior to implant. Contact with, or storage in, a glutaraldehyde-containing solution resulted in more calcium accumulation than observed in those specimens maintained free of additional exposure to glutaraldehyde.

### Example 3

Rinsing, or washing, was found to produce significant effects on the level of calcification in 21 day and 60 day rat subdermal implant studies as reported below in Table 1. Table 1 presents the calcium content of a set of porcine aortic

heart valve specimens following implantation in a rat subdermal pouch. The specimens were untreated glutaraldehyde-pretreated porcine aortic heart valves obtained from St. Jude Medical, Inc. (control) and treated glutaraldehyde-pretreated porcine aortic heart valves which had been subjected to 80% ethanol for 24 hours. The 80% ethanol treated specimens were then subjected to a last minute "wash" (24 hour immersion in pH 7.4 HEPES buffered saline, changed hourly), or "rinse," (defined as three one minute, 100 ml rinses with pH 7.4 HEPES buffered saline). Additional 80% ethanol treated specimens were stored in a solution of 80% ethanol and 0.2% glutaraldehyde buffered to a pH of 7.4 (HEPES) for 1 month and then subjected to a "rinse" or "wash."

TABLE 1

| Treatment Group | 21 day $Ca^{+2}$ (μg/mg) | 60 day $Ca^{+2}$ (82 g/mg) |
|---|---|---|
| Control | 183.15 ± 0.03 | 236.3 ± 6.14 |
| 80% ethanol/rinse | 11.1 ± 6.04 | 14.6 ± 10.5 |
| 80% ethanol/wash | 5.16 ± 1.72 | 1.87 ± 0.29 |
| 80% ethanol/Glut. storage/rinse | 3.13 ± 1.67 | 22.9 ± 8.14 |
| 80% ethanol/Glut. storage/wash | 4.11 ± 2.4 | 18.3 ± 8.31 |

Specimens of glutaraldehyde-pretreated bovine pericardium were treated in 80% ethanol followed by a 24 hour wash. The calcium content of rat subdermal implants following 21 days was 2.95±0.78 μg/mg. In comparison, the calcium content of untreated control specimens was 121.16±7.49 μg/mg.

### Example 4

Studies were conducted with glutaraldehyde-pretreated porcine aortic heart valve specimens in order to assess efficacy of the method of the present invention for calcification-resistance in vivo. Glutaraldehyde-pretreated porcine aortic heart valve specimens were obtained from St. Jude Medical, Inc. (St. Jude) and from Medtronic, Inc., (Hancock I). Control specimens were not exposed to alcohol treatment. Experimental specimens were subjected to 80% ethanol for 72 to 96 hours. Control and experimental specimens were implanted in juvenile sheep as mitral valve replacements. Five months after implant, the valves were explanted and analyzed for calcium content. The results are shown in FIG. 3 which is a graphical representation of the calcium content (μg/mg) of the explanted specimens (10 sheep per group) at 150 days. Complete inhibition of calcification is shown by ethanol treatment. For comparative purposes, the calcium content of fresh, unimplanted porcine aortic heart valve specimens is shown.

### Example 5

While not wishing to be bound by a particular theory, it is postulated that the alcohol irreversibly alters the devitalized membrane of glutaraldehyde-pretreated bioprosthetic tissues. Proton NMR studies show an altered association with water following alcohol treatment. Table 2 shows the T1 and T2 relaxation times for proton NMR measurements (7.5 Tesla instrument) conducted on fresh porcine aortic heart valve specimens, as well as glutaraldehyde-pretreated specimens and glutaraldehyde-pretreated specimens which have been subjected to treatment in 80% ethanol in accordance with the principles of the invention. Treatment with ethanol results in significantly prolonged T1 and T2 relaxation times indicating a water-rich environment which is much less conducive to calcium phosphate precipitation.

5,746,775

| 9 | 10 |

TABLE 2

|  | T1 (sec) | T2 (msec) |
|---|---|---|
| Untreated | 1.84 ± 0.19 | 0.14 ± 0.1 |
| Glutaraldehyde | 1.78 ± 0.31 | 0.30 ± 0.05 |
| Ethanol | 2.36 ± 0.36 | 0.42 ± 0.027 |

*Porcine aortic heart valve leaflets: as retrieved with no treatment (UNTREATED); treated with 0.6% glutaraldehyde (GLUTARALDEHYDE); treated with 80% ethanol (ETHANOL.) All treatment solutions were buffered to pH 7.4.

### Example 6

Alcohol treatment almost completely removes all cholesterol and phospholipids from the tissue and appears to block the uptake of plasma lipoproteins into the biomaterial. Specimens of glutaraldehyde-pretreated porcine aortic valves (cusps) were subjected to treatment in 40% ethanol, 80% ethanol, and detergent (1% SDS) for 24 hours. Untreated, glutaraldehyde-pretreated porcine aortic valve specimens were used as the control. The specimens were placed in a solution of $^{14}C$-cholesterol in bovine serum for 24 hours. FIG. 4 is a graphical representation of the cholesterol content, in $\mu g/mg$, of the treated specimens and the control. Cholesterol uptake by porcine aortic valve specimens was found to be diminished in specimens subjected to 80% ethanol for 24 hours, possibly indicating a permanent material effect that blocks the uptake of plasma lipoproteins. Detergent-treated tissue exhibited significantly higher cholesterol uptake.

Table 3 presents the total cholesterol (CS) and phospholipid (PL) content of glutaraldehyde-pretreated porcine aortic valve specimens treated for 24 hours in either buffered aqueous solutions of alcohol or chloroform-methanol as identified therein.

TABLE 3

| GROUP | Total CS* (nmole/mg) | PL* (nmole/mg) |
|---|---|---|
| Control (glu.) | 13.34 ± 0.41 | 17.24 ± 0.85 |
| 40% Ethanol | 13.96 ± 0.71 | 16.5 ± 1.49 |
| 60% Ethanol | 0.30 ± 0.05 | 4.93 ± 1.91 |
| 80% Ethanol | 0.14 ± 0.02 | 1.08 ± 0.11 |
| 1% SDS | 1.40 ± 0.1 | 0.94 ± 0.05 |
| 2:1 CHCl₃:Methanol | 0.10 ± 0.0 | 0.57 ± 0.07 |
| 80% Methanol | 0.28 ± 0.02 | 2.62 ± 0.36 |
| 80% Acetone | 0.12 ± 0.02 | 1.94 ± 0.32 |
| 80% Acetonitrile | 0.16 ± 0.04 | 2.76 ± 0.28 |

*Mean ± SEM (N = 5)

As shown in Table 3, 80% ethanol exposure removes virtually all of the cholesterol and phospholipids contained in the porcine aortic valve tissue. Detergent (SDS) had a significantly diminished effect on tissue cholesterol and phospholipid content as compared to 60% or greater ethanol.

### Example 7

Other solvents which are also known to extract cholesterol and lipids were investigated for possible anticalcification effects. Specimens of glutaraldehyde-pretreated porcine aortic valve cusps (control) were subjected to: 80% methanol, 80% isopropanol, 80% ethanol, chloroform/methanol (2:1), 80% acetonitrile, and 80% acetone for 24 hours. The specimens were implanted in subdermal pouches in rats for 21 days and the calcium content was ascertained at explant. The results are shown graphically on FIG. 5. While methanol and acetone exhibited comparable antical-

cification effects to that of ethanol, the use of these solvents is problematic inasmuch as residual methanol is potentially toxic in an implantation environment and acetone may be carcinogenic. Surprisingly, chloroform/methanol, which is the standard solution for extracting lipids, was significantly less effective than ethanol.

In another related study, a combined concentration effect was observed with 40% ethanol and 40% acetone. Individually, neither of these solvents are effective at 40% concentration (see, FIG. 1 for ethanol efficacy at 40% concentration). The calcium content of implanted porcine aortic heart valve specimens which were subjected to 40% acetone, after 21 days in a rat subdermal pouch, was 141.07±28.91 $\mu g/mg$. Whereas, the calcium content of specimens subjected to a mixture of 40% ethanol and 40% acetone was 1.54±0.16 $\mu g/mg$. Thus, a mixture of two or more solvents may be utilized in the practice of the invention provided that the combined volume of the organic solvents is greater than 50%.

### Example 8

$T_s$, which is an important measure of material strength, durability, and integrity, is almost completely unaffected by the ethanol treatment of the present invention as shown in FIG. 6. FIG. 6 is a graphical representation of the collagen denaturation temperature (°C.) for specimens of glutaraldehyde-pretreated porcine aortic valves (cusps) subjected to various treatment schemes, specifically 24 hours of exposure to ethanol (80% or 100%) and detergent (SDS). The schemes include: 80% ethanol without rinsing; 100% ethanol without rinsing; 100% ethanol followed by washing with HEPES buffered saline for 1 hour; 80% ethanol followed by rinsing with HEPES buffered saline and storage in 0.2% glutaraldehyde for 24 hours; 1% SDS followed by a HEPES buffered saline rinse; and 1% SDS followed by washing with HEPES buffered saline for 1 hour. The controls were glutaraldehyde-pretreated porcine aortic valve specimens obtained from St. Jude Medical, Inc., either as received ("Glut."), or as rinsed and stored in pH 7.4 HEPES buffered saline for 24 hours ("Glut./Buffer"). Differential scanning calorimetry was used to obtain the data. Ethanol treatment, followed by aqueous rinsing and appropriate storage conditions, had no effect on $T_s$, whereas detergent treatment significantly lowered $T_s$.

Differential scanning calorimetry was used to ascertain the amount of time required to rehydrate porcine aortic valve specimens after exposure to 80% ethanol for 24 hours. As used herein, the term "rehydrate" refers to restoring $T_s$ to the value of control (glutaraldehyde-pretreated porcine aortic valve specimens which were rinsed in pH 7.4 HEPES buffered saline for 24 hours). The ethanol treated specimens (cusps) were subjected to HEPES buffered saline (pH 7.4) for varying time periods, ranging from a rinse (i.e., pouring rinse solution over the specimen) to one hour. The results are shown in Table 4. A two minute rinse returns $T_s$ of the treated specimens to a value which is not significantly different, statistically, from the $T_s$ value of the control.

TABLE 4

| Treatment | Rinse Period | $T_s$ (°C.) |
|---|---|---|
| Control | 24 hrs | 88.33 ± 0.56 |
| 80% EtOH | rinse | 84.06 ± 0.32 |
| 80% EtOH | 1 min. | 84.49 ± 0.39 |
| 80% EtOH | 2 min. | 87.41 ± 0.23 |

A51

5,746,775

11

#### TABLE 4-continued

| Treatment | Rinse Period | $T_s$ (°C.) |
|---|---|---|
| 80% EtOH | 5 min. | 87.85 |
| 80% EtOH | 10 min. | 87.54 |
| 80% EtOH | 1 hr | 87.38 ± 0.26 |

#### Example 9

The overall protein composition and valvular morphology of porcine aortic valves are unaffected by alcoholic treatment as demonstrated by complete amino acid analysis and electron spectroscopy for chemical analyses (ESCA). In fact, alcohol treatment enhances surface smoothing and anisotropy of porcine aortic valve leaflets resulting in a surface chemistry which is comparable to fresh leaflets. In contrast, glutaraldehyde-pretreated (control) or detergent (SDS) treated tissue show significant differences. Table 5 hereinbelow presents ESCA data of the surface carbon (C1s), nitrogen (N1s), and oxygen (O1s) concentrations (%) in porcine aortic valve specimens immersed for 24 hours in the indicated solution.

#### TABLE 5

| | ATOMIC CONCENTRATION (%) | | |
|---|---|---|---|
| GROUP | O1s | N1S | C1s |
| Fresh Tissue | 20.41 | 10.06 | 69.52 |
| 80% Ethanol | 21.89 | 11.93 | 66.18 |
| 40% Ethanol | 16.45 | 7.78 | 75.76 |
| Glutaraldehyde-Fixed | 14.46 | 7.22 | 78.32 |
| 1% SDS | 19.03 | 7.37 | 73.6 |
| 2:1 CHCl₃/MeOH | 22.71 | 15.85 | 61.44 |

Complete amino acid analyses of ethanol treated, glutaraldehyde-pretreated porcine aortic valves as compared to glutaraldehyde-pretreated porcine aortic valves revealed that ethanol treatment has virtually no effect on the amino acid compositions, i.e., ethanol treatment does not extract to

12

any significant extent any of the protein components of bioprosthetic tissue.

Functional in vitro testing for mechanical and physiologic valve function demonstrated that mechanical functioning is improved by ethanol treatment in accordance with the present invention.

#### Example 10

In a series of experiments to exemplify additional embodiments of the invention, specimens of glutaraldehyde-pretreated porcine aortic valves were treated with 60% ethanol in a variety of protocols. Although the term "porcine aortic valves" generally includes both the valve cusps, or leaflets, and an aortic wall portion, the prior experiments reported hereinabove were conducted primarily on valve cusp tissue. In the present experiments, the two types of tissue have been separated and the data reported separately on Table 6.

Glutaraldehyde-pretreated bioprosthetic heart valve specimens, obtained from St. Jude Medical, Inc., were used as controls. Specimens of the glutaraldehyde-pretreated tissue were then subjected to treating solutions of 60% ethanol, or 60% ethanol and 0.1M AlCl₃, for 24 hours. Following ethanol treatment, the tissue was rinsed for 24 hours in neutral buffer, specifically HEPES at pH 7.4. Subsequent to rinsing, the tissue samples were sterilized and stored for 14 days. In some storage protocols, the tissue was packaged in neutral buffer and subjected to sterilizing radiation. In other storage protocols, the tissue was stored in solutions of 60% ethanol and glutaraldehyde (0.2% or 0.5%). In yet further storage protocols, the storage solution additionally contained 0.1M AlCl₃.

The tissue samples prepared as described above were implanted in rat subdermal pouches and analyzed for calcium content after 21 days. The results are reported below in Table 6.

#### TABLE 6

| Exp. | | Storage | μg Ca/Mg | |
|---|---|---|---|---|
| No. | Treatment | Rinse (14 Days) | Cusp | Wall |
| 1 | 24 hr 60% EtOH | 24 hr Buffer + Irrad. | 13.763 ± 3.550 | 40.892 ± 6.057 |
| 2 | 24 hr 60% EtOH + 0.1 M AlCl₃ | 24 hr Buffer + Irrad. | 6.836 ± 0.262 | 2.75 ± 0.745 |
| 3 | 24 hr 60% EtOH | 24 hr 60% EtOH + 0.2% Glut. | 9.157 ± 3.733 | 50.470 ± 1.628 |
| 4 | 24 hr 60% EtOH + 0.1 M AlCl₃ | 24 hr 60% EtOH + 0.2% Glut. | 7.029 ± 0.592 | 7.110 ± 0.915 |
| 5 | 24 hr 60% EtOH | 24 hr 60% EtOH + 0.5% Glut. | 8.791 ± 2.716 | 49.082 ± 4.217 |
| 6 | 24 hr 60% EtOH + 0.1 M AlCl₃ | 24 hr 60% EtOH + 0.5% Glut. | 8.689 ± 0.367 | 8.449 ± 0.341 |
| 7 | none | none 60% EtOH | 1.952 ± 0.446 | 60.690 ± 4.716 |
| 8 | none | none 60% EtOH + 0.2% Glut. + 0.1 M AlCl₃ | 10.326 ± 0.635 | 12.782 ± 3.469 |
| 9 | none | none 60% EtOH + 0.5% Glut. | 7.907 ± 3.635 | 39.810 ± 5.026 |
| 10 | none | none 60% EtOH + 0.5% Glut. + 0.1 M AlCl₃ | 9.568 ± 0.240 | 7.763 ± 0.368 |

**A52**

5,746,775

13                                                                      14

TABLE 6-continued

| Exp. | | Storage | μg Ca/Mg | |
|------|------|------|------|------|
| No. | Treatment | Rinse (14 Days) | Cusp | Wall |
| | Control (No Treatment) | — — | 107.059 ± 3.239 | 49.915 ± 2.160 |

As shown in Table 6, in embodiments where the biomaterial is specifically aortic wall tissue, incorporation of $Al^{+3}$ in the treatment solution, or storage solution, results in much greater inhibition of calcification than treatment with an alcohol solution.

Example 11

Specimens of the glutaraldehyde-pretreated porcine aortic wall tissue were subjected, for 24 hours, to aqueous (pH 7.4 buffered HEPES) treating solutions of 0.1M $FeCl_3$; 0.01M $FeCl_3$; 80% ethanol; 80% ethanol and 0.1M $FeCl_3$; and 80% ethanol and 0.01M $FeCl_3$. Following treatment, the tissue was rinsed in three 100 ml portions of neutral buffer, specifically HEPES at pH 7.4. Specimens of glutaraldehyde-pretreated porcine aortic wall tissue, obtained from St. Jude Medical, Inc., were used as controls. The tissue samples, prepared as described above, were implanted in rat subdermal pouches and analyzed for calcium content after 21 days. The results are reported below in Table 7.

TABLE 7

| TISSUE | PRETREATMENT | WASHING | Ca (μg/mg) |
|------|------|------|------|
| Porcine Aortic Wall | Control | No | 36.46 ± 4.04 |
| | 0.1 M $FeCl_3$ | Rinse | 13.37 ± 1.5 |
| | 0.01 M $FeCl_3$ | Rinse | 13.52 ± 2.93 |
| | 80% EtOH | Rinse | 18.55 ± 3.61 |
| | 80% EtOH + 0.1 M Fe | Rinse | 6.31 ± 0.55 |
| | 80% EtOH + 0.01 M Fe | Rinse | 7.01 ± 1.03 |

Table 7 demonstrates that incorporation of $Fe^{+3}$ ions in the alcohol treatment and/or storage solutions will produce improved resistance to calcification for porcine aortic wall specimens.

Although the invention has been described in terms of specific embodiments and applications, persons skilled in the art can, in light of this teaching, generate additional embodiments without exceeding the scope or departing from the spirit of the claimed invention. Accordingly, it is to be understood that the drawing and description in this disclosure are proffered to facilitate comprehension of the invention, and should not be construed to limit the scope thereof.

What is claimed is:

1. A method of treating a biomaterial, the method comprising the steps of:

(1) forming a liquid treatment solution consisting essentially of greater than 50% by volume of a water-soluble C1–C3 aliphatic alcohol in an aqueous buffer of a pH between 6.0 and 8.0;

(2) exposing the biomaterial, wherein the biomaterial is a collagenous material derived from a mammalian species selected from the group consisting of bovine pericardium, porcine aortic heart valves, saphenous bypass grafts, aortic homografts, and dura mater, to the liquid treatment solution for a period of time sufficient to render the biomaterial resistant to calcification; and

(3) rinsing the exposed biomaterial with a rinsing solution.

2. The method of claim 1 wherein the biomaterial rendered resistant to calcification is rendered resistant to in vivo pathologic calcification.

3. The method of claim 1 wherein said step of exposing comprises immersing the biomaterial in the liquid treatment solution.

4. The method of claim 3 wherein the alcohol is present in an amount of approximately between 60% and 80% by volume of the liquid treatment solution.

5. The method of claim 3 wherein the treatment solution further contains an anticalcification agent.

6. The method of claim 5 wherein the anticalcification agent is a multivalent metallic cation selected from the group consisting of a salt of $Al^{+3}$ and $Fe^{+3}$ which is soluble in the treatment solution.

7. The method of claim 6 wherein the anticalcification agent is $AlCl_3$ in a concentration range of from about 0.1M to 0.001M.

8. The method of claim 1 wherein the water-soluble aliphatic alcohol is selected from the group consisting of methanol, ethanol, propanol, and isopropanol.

9. The method of claim 8 wherein the water-soluble aliphatic alcohol is ethanol.

10. The method of claim 1 wherein the biomaterial has been cross-linked.

11. The method of claim 10 wherein the biomaterial has been crosslinked with glutaraldehyde.

12. The method of claim 1 wherein the time sufficient to render the biomaterial resistant to calcification is at least about 20 minutes.

13. The method of claim 12 wherein the time sufficient to render the biomaterial resistant to calcification is between about 24 to 96 hours.

14. The method of claim 1 wherein there is provided the further step of storing the treated biomaterial in a sterile, glutaraldehyde-free environment.

15. The method of claim 1 wherein there is provided the further step of storing the treated biomaterial in a storage solution of a lower aliphatic alcohol and glutaraldehyde.

16. The method of claim 15 wherein the storage solution is an aqueous solution containing approximately between 60% to 80% by volume of ethanol and approximately between 0.2% to 0.5% glutaraldehyde.

17. The method of claim 3 wherein the biomaterial is an aortic valve cusp and the alcohol is ethanol.

18. The method of claim 5 wherein the biomaterial is an aortic valve wall, and the anticalcification agent is an aluminum salt in ethanol.

19. The method of claim 1 wherein there is provided the further step of sterilizing the bioprosthetic tissue.

20. The method of claim 1 wherein the treatment solution is buffered to a pH in the range of between 7.0 and 7.6.

21. The method of claim 20 wherein the liquid treatment solution is buffered to a pH of 7.4.

A53

5,746,775

15

22. The method of claim 4 wherein the alcohol is present in an amount of approximately 80% by volume of the liquid treatment solution.

23. A method of making calcification-resistant biomaterial for use in the interior of a human or animal, the method comprising the steps of:

    a) subjecting glutaraldehyde pre-treated bioprosthetic tissue, wherein the bioprosthetic tissue is a collagenous material derived from a mammalian species selected from the group consisting of bovine pericardium, porcine aortic heart valves, saphenous bypass grafts, aortic homografts, and dura mater, to an aqueous, treatment solution of at least about 50% by volume of a water-soluble C1–C3 aliphatic alcohol for a period of time between about 20 minutes and 96 hours; and

    b) rinsing the bioprosthetic tissue.

24. The method of claim 23 wherein there is provided the further step of:

    c) storing the bioprosthetic tissue in a sterile, buffered solution of approximately between 0.2% to 0.5% glutaraldehyde and at least 60% ethanol.

25. The method of claim 23 wherein the alcohol is ethanol.

26. The method of claim 23 wherein the solution further contains an anticalcification agent which is a multivalent metallic cation selected from the group consisting of a salt of $Al^{+3}$ and $Fe^{+3}$.

27. The method of claim 26 wherein the anticalcification agent is an aluminum salt in ethanol.

16

28. The method of claim 23 wherein the alcohol is present in an amount of approximately between 60% and 80% by volume of the treatment solution.

29. The method of claim 28 wherein the alcohol is present in an amount of approximately 80% by volume of the liquid treatment solution.

30. A method of treating a biomaterial, the method comprising the steps of:

    (1) forming a liquid treatment solution consisting essentially of a water-soluble C1–C3 aliphatic alcohol in an amount of greater than about 40% by volume and a further organic solvent, wherein the combined amount of the alcohol and organic solvent is greater than about 50% by volume, in an aqueous buffer at pH between about 6.0 and 8.0;

    (2) exposing the biomaterial, wherein the biomaterial is a collagenous material derived from a mammalian species selected from the group consisting of bovine pericardium, porcine aortic heart valves, saphenous bypass grafts, aortic homografts, and dura mater, to the liquid treatment solution for a period of time sufficient to render the biomaterial resistant to calcification; and

    (3) rinsing the exposed biomaterial in a rinsing solution.

31. The method of claim 30 wherein the treatment solution includes about 40% alcohol and 40% organic solvent.

32. A biomaterial produced by the process of claims 1 or 23 or 30.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Appellant The Regents of the University of Michigan with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 12th day of November, 2014, and served a copy on counsel of record by the CM/ECF system.

*/s/ William F. Lee*

WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,964 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


*/s/ William F. Lee*

WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

November 12, 2014